UNITED STATES OF AMERICA,
Plaintiff–Appellee,

v.

Kirk STEWART (98–6753; 99–5196);
Laura Stewart (99–5025),
Defendants–Appellants.

Nos. 98–6753, 99–5196, 99–5025.

United States Court of Appeals,
Sixth Circuit.

Feb. 27, 2001.

Before MARTIN, Chief Judge; SUHRHEINRICH, Circuit Judge; and OLIVER, District Judge.*

PER CURIAM.

Defendants Kirk and Laura Stewart appeal their convictions and sentences for conspiracy to manufacture and possess methamphetamine with intent to distribute, under 21 U.S.C. § 846, and endangering human life while illegally manufacturing a controlled substance, under 21 U.S.C. § 858. Defendant Kirk Stewart also appeals his conviction for being in control of property used for drug manufacturing, in violation of 21 U.S.C. § 856.[1] Laura argues that (1) insufficient evidence exists to support her convictions, and (2) the court erred by failing to sentence Laura based on an individualized finding of the level of her participation in the conspiracy. Kirk argues that (1) his 6th Amendment Confrontation Clause, *Brady,* and Jencks Act rights were violated when the government withheld exculpatory evidence, (2) his right to a fair trial was impaired by the government's use of false testimony, (3) the evidence was insufficient to support his convictions, (4) he received ineffective assistance of counsel at trial, (5) the court erred in its determination, for sentencing purposes, of the amount of drugs allegedly produced, and (6) the government violated the anti-gratuity statute, 18 U.S.C. § 201(c)(1), by moving for Rule 35 relief

for two witnesses, subsequent to the instant trial. We AFFIRM.

I.

Firefighters from Shelby County answered a fire call on the morning of July 13, 1997, at the home of Defendants. The fire was burning in the upper portion of a two-story garage, separate from the residence. Peculiar yellow smoke poured out from the structure.

As firefighters began to combat the blaze, Kirk Stewart identified himself as the owner of the premises and asked them to allow the building to burn to the ground because it was unsafe. Kirk also informed firefighters that there was no way to access the garage's upper level. Upon entering the garage, firefighters located a stairway and ascended to the upper level, where they saw 50–60 open ether cans, glass jars, tables, an air conditioner, and a safe. A strong smell of ammonia and acid permeated the air, which caused the hospitalization of four firefighters who suffered respiratory complications.

Suspecting that the upper level of the garage was being used to manufacture drugs, firefighters contacted the Shelby County Sheriff's Department and the Drug Enforcement Administration ("DEA"). They obtained a search warrant for the premises, including Defendants' residence. In addition to the items observed by the firefighters inside the burned garage, police collected protective goggles, coffee filters containing traces of methamphetamine, plastic tubing, a glass pipe of a type commonly used to smoke drugs, a microwave oven, glass vials containing methamphetamine residue, empty medicine bottles

---

*The Honorable Solomon Oliver, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

1. Although Laura Stewart was also charged with possession of property used for drug manufacturing under § 856, this count was dismissed, as to her, by the court during trial.

that once contained antihistamines,[2] "hundreds or thousands" of empty antihistamine "blister packets," triple beam scales, and a box of aluminum foil packets cut into small squares.[3]

In the safe stored above the garage, police discovered a "brick" of an unidentified substance, wrapped in plastic and duct tape. Suspecting that the brick was either methamphetamine or cocaine, a DEA agent cut a small sample and placed it into a field test ampule containing a solution. Upon exposure to the liquid, the sample exploded. The brick was later identified as sodium metal, a highly volatile and explosive substance that is heavily regulated and necessary to the production of methamphetamine. Officers also observed three propane tank cylinders with plastic tubing, the valve areas of which had been stained blue.[4] In Kirk Stewart's car, police found several receipts from different stores for antihistamines, dated July 12, 1997. In Kirk and Laura Stewart's bedroom, police located more receipts for antihistamines, some from Laura Stewart's purse, as well as more coffee filters with methamphetamine residue, and a recipe for methamphetamine. At the residence, police also discovered a prescription bottle belonging to James Cagle, who was not present at the scene.

When questioned about the large number of antihistamines, Kirk Stewart initially denied any knowledge, but eventually contended that he had been purchasing them for a man named Steven Lawson. Stewart claimed to have been ignorant of the fact that the pills were necessary to make methamphetamine.

At trial, numerous firefighters testified concerning their observations on the night of the fire. DEA agents also testified, confirming that methamphetamine was found on the premises, and that sodium metal, anhydrous ammonia, antihistamines, and coffee filters are all used to produce methamphetamine.

Steven Lawson and James Cagle, who at the time were incarcerated in Missouri on unrelated charges for producing methamphetamine, also testified at the trial. Lawson admitted to being at the Stewart's residence on the night of the fire, and that the fire started during a methamphetamine "cook," when Lawson mishandled the sodium metal. At the time of the fire, Lawson stated that they were cooking approximately five pounds of methamphetamine. Lawson claimed that Kirk and Laura had supplied Lawson, dating back to 1995, with sodium metal, antihistamines, and ether (in the form of John Deere lighter fluid), in exchange for cash and methamphetamine. Lawson also testified that the Stewarts would prepare in advance what is known as "flea powder" from the antihistamines, so that it was ready whenever Lawson arrived to perform a "cook." In total, Lawson claimed that 20–50 pounds of methamphetamine had been manufactured with the assistance of the Stewarts, and that at least two pounds would be manufactured at each cook. Finally, Lawson stated that he met with the Stewarts approximately three days after the fire, and that the Stewarts requested that Lawson tell police that the Stewarts had no knowledge of Lawson's metham-

---

**2.** Ephedrine, which is a constituent of the particular brand of antihistamines located at the Stewart premises, is a key ingredient of methamphetamine.

**3.** Aluminum foil squares are commonly used in the production of methamphetamine.

**4.** The blue coloration indicates that the tanks were, at one time, filled with anhydrous ammonia, a chemical used in methamphetamine production.

phetamine operation, and were only purchasing antihistamines for Lawson to "resell."

James Cagle testified that he had been to the Stewart residence approximately five times with Lawson to cook methamphetamine. Cagle corroborated Lawson's testimony that the Stewarts would supply antihistamines and produce "flea powder," in exchange for cash and methamphetamine. Cagle also stated that Kirk Stewart, through his position as a high school teacher, had secured a brick of sodium metal. Cagle admitted to being present on the night the fire started, and that in his haste to leave he forgot his prescription bottle. Finally, Cagle testified that he was present when Lawson met with the Stewarts three days after the fire, and that they asked Lawson to corroborate the story they had given to the police.

Both Lawson and Cagle were questioned on cross-examination about any "deals" they had struck with the government in exchange for their testimony. Both initially denied that they had been promised anything, but each professed awareness of the possibility of a Rule 35 motion for a reduction in sentence. Upon further examination. Cagle admitted that, at a "proffer interview" with Missouri DEA agents, he had been given "immunity" from prosecution in exchange for information. Lawson, although admitting that he had not been indicted in connection with the events at the Stewarts' house, continued to deny that he had been given immunity.

Kirk Stewart was convicted and sentenced to concurrent terms of (1) 242 months of imprisonment for Count 1, (2) 120 months for Count 2, and (3) 240 months for Count 3. Additionally, Kirk was given concurrent five-year terms of supervised release. Laura Stewart was convicted and sentenced to concurrent terms of

(1) 168 months for Count 1, and (2) 120 months for Count 2. She was also given a five-year term of supervised release.

After the trial, Defendants moved for a new trial based on allegedly newly-discovered evidence. The new evidence was the testimony of Charles Degan, an inmate incarcerated with Lawson, who claimed that Lawson had admitted to testifying falsely against the Stewarts. The motion was denied because Degan's testimony was deemed by the court to be merely impeaching, and was not likely to change the outcome.

On motion for reconsideration, Kirk Stewart contended that the government had violated its *Brady* obligation to produce all exculpatory evidence material to the trial by failing to inform Defendants that both Lawson and Cagle had been promised immunity in exchange for their testimony, and by failing to inform the Defendants that Lawson had once worked for Noranda, a local aluminum manufacturing plant, from which bars of sodium metal had been stolen. Kirk Stewart also claimed that the government had violated Defendants' Sixth Amendment Confrontation Clause and Fifth Amendment Due Process rights by presenting perjured testimony. The court ordered an evidentiary hearing.

At the hearing, a new witness. David Mikel, testified. Mikel, who was incarcerated in the same facility as Lawson, testified that he had cooked methamphetamine with Lawson at the Stewart residence on two occasions (but not when the fire occurred), and that at no time was more than eight ounces produced. Also, Charles Degan and various other witnesses testified that while incarcerated, Lawson admitted to testifying falsely against Kirk Stewart in exchange for a reduced sentence. Finally, Stewart presented (1) documentary evidence that Cagle had been given immunity from prosecution at a "proffer inter-

view," and (2) a post-trial letter from Timothy DiScenza, the federal prosecutor in Tennessee, to a federal prosecutor in Missouri, which stated that "assurances" had been made to Lawson that his cooperation in the Stewart trial would be made known to the federal prosecutor in Missouri. Stewart contended that he should have been given this information prior to, or at least during trial, and that by failing to do so, the government violated *Brady*, the Jencks Act, and Stewart's Fifth and Sixth Amendment rights. The district court again denied a new trial.

## II.

### A. Kirk Stewart

#### 1. Sixth Amendment Confrontation Clause, *Brady*, and Jencks Act Rights

Kirk Stewart contends that the government's failure to provide him with allegedly exculpatory material violated his rights under (1) the Confrontation Clause of the Sixth Amendment. (2) *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and (3) the Jencks Act, 18 U.S.C. § 3500. Stewart raised these arguments in connection with his motion for reconsideration of the order denying a new trial. We review for abuse of discretion the determination of whether to grant a motion for new trial. *See United States v. Glover*, 21 F.3d 133, 138 (6th Cir.1994). We have noted that such motions "should be granted sparingly and with caution." *United States v. Turner*, 995 F.2d 1357, 1364 (6th Cir.1993).

#### a. Confrontation Clause

Stewart claims that his Confrontation Clause right was violated when Lawson and Cagle did not admit to the "deals" that they had allegedly entered with the government. The Confrontation Clause of the Sixth Amendment guarantees every criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. This right has been construed "as a right to subject the testimony of witnesses against the defendant to adversarial cross-examination." *United States v. McCleskey*, 228 F.3d 640, 643 (6th Cir.2000).

■ We reject Stewart's argument because the Confrontation Clause does not guarantee "cross-examination that is effective, in whatever way, and to whatever extent, the defense might wish." *See Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985). At trial, Stewart was able to cross-examine both Lawson and Cagle. To the extent that Stewart's Confrontation Clause argument implicates *Brady* and Jencks Act material, these will be analyzed in the following appropriate sections.

#### b. *Brady* Violations

■ Kirk Stewart contends that the government violated his *Brady* rights by failing to disclose (1) information that Lawson had worked at an aluminum manufacturing plant called Noranda, and that sodium metal had been reported stolen from Noranda, (2) alleged documents suggesting that Lawson and Cagle had entered into an immunity agreement with the government in exchange for their testimony against the Stewarts, (3) that Lawson and Cagle had been promised Rule 35 relief by the Tennessee prosecutor, and (4) the statement by Mikel that Lawson was testifying falsely against the Stewarts. A defendant is entitled to a new trial based on *Brady* if the prosecution suppressed exculpatory evidence material to the outcome of the trial. *See Schledwitz v. United States*, 169 F.3d 1003, 1011–12 (6th Cir.1999). For *Brady* purposes, impeaching evidence is considered exculpatory.

*See id.* at 1011. Additionally, a court must evaluate the effect of all exculpatory evidence cumulatively. *See United States v. Frost,* 125 F.3d 346, 383 (6th Cir.1997). Materiality does not require that the suppressed evidence establish the defendant's innocence or likelihood of an acquittal. *See id.* Rather, *Brady* materiality merely requires "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley,* 514 U.S. 419, 433–34, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (internal quotation omitted). To show that the result would have been different, a defendant need not show that he would have been acquitted, but only that the suppressed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435.

Stewart's argument fails. First, the information concerning Noranda and the missing sodium metal, by itself, could not reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. At best, the information would have impeached Cagle's testimony that Stewart had supplied a bar of sodium metal. Even so, however, its impeachment value would have been minimal, inasmuch as it does not foreclose the possibility that Stewart had also supplied sodium metal. Lawson admittedly manufactured methamphetamine at numerous locations in different states, and no testimony suggested that Stewart was his exclusive source for sodium metal. Moreover, the information would not have impugned the testimony, or the physical evidence, suggesting that Stewart had supplied copious amounts of antihistamines and ether. Nor would it have seriously undermined the conclusion that Stewart's garage was a methamphetamine lab.

Second, so far as the record reveals, there are no documents suggesting that Lawson and Cagle had entered into an immunity agreement in exchange for testimony. Lawson consistently denied ever having reached any sort of immunity agreement. Cagle indicated on cross-examination that he "understood" that he would not be prosecuted for acts that he described in a proffer interview with Missouri DEA agents. Although Cagle believed that this agreement had been memorialized in writing, he could not be certain. Thus, there is no evidence to suggest that Lawson and Cagle were given immunity for their trial testimony. Although Cagle's testimony indicates that he was given immunity in connection with the proffer interview, this information was properly elicited on cross-examination to impeach Cagle. Given these circumstances, we conclude that Stewart has failed to identify any *Brady* material, much less demonstrated that any such evidence would have had an effect on the outcome of the trial.

Third, there is no evidence suggesting that the Tennessee federal prosecutor, DiScenza, had promised to make Lawson and Cagle's cooperation known to the Missouri prosecutor in exchange for their testimony. Stewart's only evidence of this alleged promise is a letter from DiScenza to the Missouri federal prosecutor, stating that Lawson and Cagle had been "assured" that their cooperation would be mentioned to the Missouri prosecutor. This letter, however, does not implicate *Brady* because it is dated December 12, 1998, nearly four months after the guilt phase of the trial ended. Thus, the letter itself could not have been *Brady* material because it did not exist at the time of the trial. To the extent that "assurances" may have been made and suppressed prior to the trial, DiScenza stated, upon question-

ing by the court at the hearing on the motion to consider denial of a new trial, that he made assurances to Lawson and Cagle only after the trial had concluded. No evidence was offered by the Defendants to discredit the prosecutor's statement, and in any event, it was within the court's discretion to believe DiScenza.

Fourth, no evidence suggests that Mikel's testimony concerning Lawson was *Brady* material. Stewart has not shown that the United States had Mikel's statement prior to, or even during, the trial. Although Mikel testified at the evidentiary hearing that he had been interviewed by an "Italian prosecutor" prior to the trial, he also testified that DiScenza was not that person. In any event, even if the government suppressed Mikel's testimony, the statement would only have impeached Lawson's credibility. It would not have undercut Cagle's testimony, nor would it have impugned the vast physical evidence found at Stewart's residence. Thus, it is not sufficient to undermine faith in the outcome.

Therefore, we hold that, even taken together, these alleged *Brady* violations do not create a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.

c. Jencks Act Violations

██ Stewart asserts that the government violated his rights under the Jencks Act, 18 U.S.C. § 3500(b), which provides that the "court shall, on motion of the defendant, order the United States to produce any statement ... of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." The term "statement" is defined, in part, as a signed written statement made or adopted by the witness, or a substantially verbatim re-

cording or transcription of an oral statement recorded contemporaneously with the making of such statement. *See* 18 U.S.C. § 3500(e)(1)-(2). In this Circuit, the disclosure of Jencks Act material that is also arguably *Brady* material is governed by the Jencks Act. *See United States v. Bencs*, 28 F.3d 555, 561 (6th Cir.1994). In other words, to the extent that a witness' statement could be either *Brady* material or Jencks Act material, the government need not disclose that statement until after the witness has completed direct examination.

Stewart argues that the government violated the Jencks Act by failing to produce alleged statements made by Lawson and Cagle at their "proffer interview." However, this claim fails because Stewart has not shown that either of these witnesses ever made a statement within the meaning of the Jencks Act. Stewart's counsel admitted as much at the hearing on Defendants' motion for reconsideration of the denial of a new trial: "[S]o as far as the [proffer] interviews, I understand that we are kind of in a big circle on that, because we are not sure of what all was said. We have some idea, but we can't prove it because we can't get those interview notes, *there was no actual statement.*" (Def's Recons. Mot. Hr'g Tr. at 7–8) (emphasis added). Thus, at most, it appears that the interviewers took handwritten notes, which do not fall under the Jencks Act definition of a "statement." Therefore, we reject Stewart's claim.

2. Due Process

██ Stewart argues that his due process right to a fair trial was impaired by the government's knowing use of false testimony from Cagle and Lawson. To establish prosecutorial misconduct in introducing false testimony, the defendant must prove three elements: "(1) the statement

was actually false; (2) the statement was material; and (3) the prosecution knew it was false." *United States v. Lochmondy,* 890 F.2d 817, 822 (6th Cir.1989). When a prosecutor engages in misconduct, we must reverse the conviction unless the error is harmless. *See United States v. Young,* 470 U.S. 1, 13 n. 10, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). The prosecution's knowing introduction of false testimony "constitutes a denial of due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Lochmondy,* 890 F.2d at 822.

▮ Stewart contends that the government knowingly allowed Cagle and Lawson to testify falsely. Specifically, Stewart points to the "immunity" agreement for the "proffer interview" between Cagle, Lawson, and the government, which Lawson denied, and which Cagle initially denied, at trial. Further, Stewart highlights Mikel's testimony on the motion for a new trial that he had cooked methamphetamine with Lawson and Cagle at the Stewarts' residence on two occasions prior to the fire, that no more than eight ounces of methamphetamine had been produced each time, and that the Stewarts had not been home at the time. To bolster his claim, Stewart points to an alleged statement by Lawson on January 27, 1998, that Mikel was present when the fire started. This statement contradicts Lawson's trial testimony that only Cagle, James Vaughn, Lawson, and the Stewarts were present when the fire occurred.

We reject Stewart's argument because he has not demonstrated that the prosecution knowingly presented material false testimony. First, although Stewart claims otherwise, it was clear at trial that Cagle had provided information to the Missouri prosecutor at the proffer interview on the understanding that he would not be prose-

cuted in Tennessee. Thus, Cagle did not testify falsely. Lawson denied reaching a similar agreement with the Missouri prosecutors, and Stewart has not proffered contradictory evidence. Even if Stewart had proven that Lawson's testimony was false, we see no reasonable likelihood that this testimony affected the judgment of the jury. The jury knew that Lawson and Cagle, unlike the Stewarts, had not been indicated in Tennessee, that they were cooperating in the hope of avoiding an indictment, as well as to possibly obtain a Rule 35 motion in Missouri. The mere existence of an agreement memorializing Lawson's and Cagle's bias would not have altered the obvious inference that Lawson and Cagle had something to gain from their testimony.

Second, contrary to Stewart's assertion, Mikel did not testify that he was present when the fire started. Rather, at the evidentiary hearing on the motion to reconsider denial of a new trial, Mikel admitted to cooking methamphetamine with Lawson at the Stewarts' residence on two occasions *prior* to the fire, but was explicit in that he was not present when the fire started. Although Stewart claims that Lawson had previously stated that Mikel was present when the fire started, this statement has not been identified in the record. Even if it had been identified, it would do nothing to change the fact that Lawson's trial testimony is consistent with Mikel's version of the events.

Finally, Mikel's statement that no more than eight ounces of methamphetamine had been produced on the occasions when he had "cooked" with Lawson does not demonstrate that Lawson gave false testimony. At best, it impeaches Lawson's testimony that at least two pounds of methamphetamine were produced at each cook. However, Mikel himself admitted that he had not actually participated in the

"cooks" at the Stewarts' residence. Rather, he had slept in a van while the others produced the drug. Thus, the impeaching value of his testimony is minimal. Additionally, even if Mikel's statement was sufficient to prove Lawson's false, nothing establishes that the prosecution knowingly offered Lawson's false testimony.

Therefore, there is no credible evidence to suggest that any statement by the government's witnesses was actually false, or that it was offered by the prosecution knowingly. Although there are some inconsistencies between statements made by Lawson, Cagle, and Mikel, without more these are insufficient to support the conclusion that prosecutorial misconduct deprived Stewart of a fair trial.

### 3. Sufficiency of the Evidence

Stewart challenges the sufficiency of the evidence. Upon review, we take the evidence in the light most favorable to the prosecution, and ask whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Lee,* 991 F.2d 343, 347 (6th Cir.1993).

To obtain a conviction under 21 U.S.C. § 846, the government must prove the following: (1) an agreement by two or more persons to violate the drug laws, and (2) that each conspirator knew of, intended to join, and participated in the conspiracy. *See United States v. Elder,* 90 F.3d 1110, 1120 (6th Cir.1996). No formal or express agreement is required; a tacit or mutual understanding among the parties is enough. *See United States v. Phibbs,* 999 F.2d 1053, 1063 (6th Cir.1993). A conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in a common plan. *See*

*United States v. Ledezma,* 26 F.3d 636, 640 (6th Cir.1994).

To convict under 21 U.S.C. § 858, the government must demonstrate that the defendant created a substantial risk of harm to human life while manufacturing a controlled substance in violation of the law.

A conviction under 21 U.S.C. § 856 requires only that the defendant controlled a building which is knowingly made available for use, with or without compensation, for the purpose of unlawfully manufacturing a controlled substance.

Stewart's argument fails as to all three counts. Rather than discussing the quantity of evidence against him, Stewart seems only to challenge the evidence's quality. He argues exhaustively that Cagle's and Lawson's testimony was unreliable at best and outright false at worst. However, "challenges to ... credibility are not ... challenges to the sufficiency of the evidence." *United States v. Latouf,* 132 F.3d 320, 330 (6th Cir.1997); *see also United States v. Welch,* 97 F.3d 142, 148 (6th Cir.1996) (refusing, on appeal, to weigh or judge the credibility of evidence).

Here, taking the evidence in the light most favorable to the prosecution, Stewart supplied antihistamines, ether, and sodium metal to Lawson and Cagle. Stewart allowed them to use the upper level of the garage, located on the property Stewart leased, as a methamphetamine laboratory. Stewart was paid partly in methamphetamine. A fire broke out at one "cook" when sodium metal was mishandled. When firefighters arrived on the scene, Kirk Stewart told them there was no way to access the upper level of the garage, the source of the blaze. Ultimately, police located methamphetamine inside the Stewarts' residence in vials and coffee filters, and a recipe for the drug was located in the Stewarts' bedroom. Expert witnesses testified that sodium metal and

anhydrous ammonia are dangerous chemicals. Finally, the Stewarts' approached Lawson after the fire and requested that he corroborate their cover story.

Simply stated, there is ample evidence on these facts upon which to base convictions for violations of 21 U.S.C. §§ 846, 856, and 858. Kirk and Laura had, at the very least, arrived at a tacit or mutual understanding with Lawson and Cagle that the Stewarts would supply ingredients and a laboratory in exchange for cash and drugs. In the course of the conspiracy. Kirk Stewart endangered human life by storing, and allowing his co-conspirators to use, dangerous chemicals. Further, Stewart endangered human life by attempting to prevent the firefighters from extinguishing the fire. Finally, Stewart was the lessee of, and hence controlled, the premises which he knowingly proffered to Lawson for the production of drugs. Thus, Stewart's challenge to the sufficiency of the evidence lacks merit.

### 4. Ineffective Assistance of Counsel

Stewart argues that he received ineffective assistance of trial counsel, based on his counsel's failure to (1) collect information pertaining to the Noranda plant, (2) locate David Mikel prior to trial, (3) investigate Lawson and Cagle's arrest records, (4) locate Lawson and Cagle's proffer interview statements, and (5) challenge the constitutionality of the search warrant obtained by the Shelby County Sheriff's Department.

■ This claim fails because ineffective assistance of counsel claims are not generally cognizable on direct appeal. See United States v.. Tucker, 90 F.3d 1135, 1143 (6th Cir.1996). Such a claim is cognizable only when the record is adequate to assess the merits of the defendant's contention. See United States v. Kincaide, 145 F.3d 771, 785 (6th Cir.1998). Here, as the Unit-

ed States points out, Stewart has raised this claim for the first time, and the record is inadequate to establish the accuracy of Stewart's version of his trial counsel's performance. Moreover, we cannot ascertain on this record "whether the alleged wrongful acts could be considered sound trial strategy." See id. We will not review Stewart's ineffective assistance claim on direct appeal under such circumstances.

### 5. Sentencing

■ Stewart argues that he was not properly sentenced because, in determining the relevant quantity of methamphetamine, the court relied heavily on the testimony of Lawson and Cagle, which Stewart characterizes as unreliable at best. We review for clear error the district court's determination of the amount of drugs for which a defendant is accountable. See United States v. Walton, 908 F.2d 1289, 1300 (6th Cir.1990). A court's approximation of the amount involved is not clearly erroneous if supported by competent evidence in the record. See United States v. Mahaffey, 53 F.3d 128, 132 (6th Cir.1995). Generally, under USSG § 1B1.3(a)(1)(B), a co-conspirator is held responsible at sentencing for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." However, with respect to drug conspiracies under 21 U.S.C. § 846, a court "may not, without further findings, simply sentence a defendant to the amount of narcotics involved in the conspiracy." United States v. Tucker, 90 F.3d 1135, 1144 (6th Cir.1996) (internal quotation omitted). Rather, the district court must support its calculation of the quantity of drugs for which a co-conspirator is responsible with "individualized findings regarding the scope of the conspiracy and the nature of each defendant's participation in the scheme." United States v. Meacham, 27 F.3d 214, 217 (6th Cir.1994).

Lawson testified that twenty to fifty pounds of methamphetamine had been produced over a period of years with Stewart's assistance. Stewart argues that Mikel's testimony, that Lawson never produced more than eight ounces at a time, directly refutes Lawson's testimony, and that the physical evidence found at the scene (including thousands of empty antihistamine packets), is insufficient to establish that three kilograms (or 6.6 pounds) were cooked.

The Presentence Report ("PSR") indicated that Stewart had been involved with at least 5.2 kilograms of methamphetamine (or 11.5 pounds), which resulted in a base level of 34 under the 1995 version of USSG § 2D1.1(a)(3)(c)(3). This figure was calculated by reference to Lawson's statement to the DEA, which Judge Turner admitted was more detailed than Lawson's trial testimony. Nevertheless, Judge Turner concluded that Lawson and Cagle's trial testimony, combined with other circumstantial evidence, including the physical evidence at the scene, strongly supported a sentence based on at least three kilograms, but less than ten kilograms. Under the 1995 Guidelines Manual, Stewart's base offense level was thus set at 34.

■ We conclude that the court's determination was not clearly erroneous. First, as Judge Turner concluded, Lawson and Cagle's testimony, combined with physical evidence at the scene, including empty blister packets, empty anhydrous ammonia tanks, and burning barrels which appeared to have been used to destroy evidence, supports the conclusion that Stewart was responsible for at least three kilograms of methamphetamine. Second, Mikel's testimony does not directly refute Lawson's testimony because Mikel admitted that he had only cooked with Lawson and Cagle on a few occasions. Even if Mikel is correct that on those occasions no more than eight ounces of methamphet-

amine was produced, Mikel did not, and could not, testify as to how much was produced at other times. In any event, Mikel's testimony does not change the fact that Judge Turner's determination is supported by competent evidence in the record, and therefore is not clearly erroneous.

### 6. The Anti-gratuity Statute

■ Stewart argues that by "purchasing" Lawson and Cagle's testimony with assurances of immunity and Rule 35 motions, the United States violated the anti-gratuity statute, 18 U.S.C. § 201(c)(2). Apart from Stewart's failure to demonstrate, on these facts, that the United States had "purchased" testimony, Stewart's claim fails because the anti-gratuity statute does not apply to federal prosecutors, or the United States government. *See United States v. Ware*, 161 F.3d 414, 418–24 (6th Cir.1998). Stewart cites *United States v. Singleton*, 144 F.3d 1343 (10th Cir.1998), where a three-judge panel initially held that the statute applied to the United States and its alter egos. However, that decision was reversed by the Circuit *en banc* at *Singleton*, 165 F.3d 1297 (10th Cir.1999). In short, there is simply no merit to Stewart's argument.

### B. Laura Stewart

### 1. Sufficiency of Evidence

Laura Stewart challenges her conviction based on the sufficiency of the evidence. As noted above, Laura was convicted of only two counts: (1) conspiracy to manufacture a controlled substance with intent to distribute under 21 U.S.C. § 846, and (2) endangering human life while manufacturing a controlled substance under 21 U.S.C. § 858. The standard under which we evaluate this challenge is the same as for Kirk Stewart, set out in Section II(A)(3), above.

Specifically, Laura contends that there was no proof that she understood the goal

of the conspiracy, or that she acted with the purpose of furthering the conspiracy. She admits to being present during some of the discussions or activities concerning the manufacture of methamphetamine, but contends that her mere presence was not sufficient to convict her on the conspiracy charge.

■ We affirm the conviction because the evidence, taken in a light most favorable to the prosecution, is sufficient that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. Laura Stewart washed the glassware in which the methamphetamine was produced, a recipe for methamphetamine was found in her bedroom, both Cagle and Lawson testified that she would purchase antihistamines and ether, and police found receipts for antihistamines in her purse. Because dangerous materials were used in the course of her participation in the drug scheme, the evidence is also sufficient to support her conviction for endangering human life in connection with the garage fire. Thus, we affirm the convictions.

### 2. Sentencing

Laura Stewart challenges her sentence, arguing that the court failed to sentence her based on individualized findings of her participation in the conspiracy. Laura also contends that she should have been sentenced as a minimal participant under USSG § 3B1.2(a), rather than as a minor participant. The standard of review for this claim is the same as that set out above in Section II(A)(5). Additionally, the court's determination of mitigating role adjustments is reviewed for clear error. *See United States v. Owusu*, 199 F.3d 329, 337 (6th Cir.2000).

Specifically, Laura Stewart claims that the court's finding relative to the quantity of drugs for the conspiracy charge was based solely on Lawson's testimony, which is unreliable and explicitly contradicted by the physical evidence and by Charles Degan, who testified at the sentencing hearing. Degan, a fellow inmate of Lawson's, testified that Lawson had indicated that the Stewarts did not know about the methamphetamine operation. Laura also purports to challenge her sentence on the § 858 endangering human life charge, although she does so only by stating that if the conspiracy sentence is thrown out, her § 858 sentence must necessarily be thrown out.

■ We affirm the sentence because it is supported by competent evidence in the record, and was based on individualized findings of Laura's participation. First, the court concluded that Lawson's testimony was more credible than Degan's. Even so, the court based the ultimate quantity on a very strict reading of Lawson's testimony, concluding that at least three kilograms, but less than ten kilograms, had been produced either through the Stewarts' acts, or through the reasonably foreseeable acts of their co-conspirators. Lawson testified that 10,000 antihistamine pills would be necessary for one pound of methamphetamine. Stewart claims that the court's quantity is not supported by the physical evidence because the police did not locate roughly 60.000 empty antihistamine packets. However, ample evidence suggested that the conspiracy had continued for numerous cooks over approximately two years, and that barrels set up on the Stewarts' property, which were littered with empty packets, among other things, had been used to burn evidence. Thus, it was not unreasonable for the court to assume that at least some of the evidence had been destroyed, and that Lawson's figures, narrowly read, were accurate.

■ Laura Stewart's challenge to the determination that she was a minor partic-

ipant, rather than a minimal participant, similarly fails. She argues that, based on the facts, she should have received a four point reduction as a "minimal participant" under USSG § 3B1.2(a). However, the minimal participant reduction should be used infrequently, and is intended to apply to those who are plainly among the least culpable of the those involved in the conduct of a group. *See* USSG § 3B1.2, cmt. 1 (Nov.1995). For example, it would be appropriate for "someone who played no other role in a very large drug smuggling operation than to offload part of a single marijuana shipment, or in a case where an individual was recruited as a courier for a single smuggling transaction involving a small amount of drugs." *Id.* at cmt. 2. In distinction, a "minor participant" is one who is less culpable than most other participants, but whose role could not be described as minimal. *See id.* at cmt. 3. Here, the evidence establishes that Laura Stewart washed the dishes used to manufacture the methamphetamine, purchased vast quantities of antihistamines and ether, and was present for discussions and actions relevant to the conspiracy. Moreover, she was involved over an extended period of time—certainly longer than that contemplated by the "minimal participant" definition. The court did not abuse its discretion in sentencing her as a minor participant, rather than as a minimal participant.

Therefore, we affirm Laura Stewart's sentence.

### III.

For the foregoing reasons, we AFFIRM the convictions and sentences of Kirk and Laura Stewart.