**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Jeffrey Eugene WEATHERS, Defendant–Appellant.**

**No. 97–5903.**

United States Court of Appeals, Sixth Circuit.

Argued Oct. 29, 1998.

Decided Feb. 26, 1999.

Rehearing and Suggestion for Rehearing En Banc Denied April 9, 1999.

---

Scott T. Wendelsdorf (argued and briefed), Jamie L. Haworth, Asst. F.P. Defender, Federal Public Defender's Office, Louisville, Kentucky, for Defendant–Appellant.

Terry M. Cushing (briefed), Monica Wheatley (argued and briefed), Asst. U.S. Attorneys, Office of the U.S. Attorney, Louisville, Kentucky, for Plaintiff–Appellee.

· Before: DAUGHTREY and MOORE, Circuit Judges; COHN,* District Judge.

DAUGHTREY, Circuit Judge.

In this appeal, we · are asked to decide whether the use of a cellular telephone in a murder-for-hire scheme satisfies the interstate commerce jurisdictional requirement of the federal murder-for-hire statute, 18 U.S.C. § 1958, where both parties to the conversation were within the state of Kentucky at the time of the telephone calls, but use of the cellular phone involved an interstate signal sent to communications equipment in both Kentucky and Indiana.

The district court held that this constituted "use of a facility in interstate commerce," as defined by the statute, and denied the defendant's motions for judgment of acquittal. A jury convicted Jeffrey Eugene Weathers on the federal murder-for-hire charge, as well as an armed drug-trafficker charge under 18 U.S.C. § 924(c). Weathers also pleaded guilty to three counts of distributing cocaine and one count of carrying a firearm during and in relation to one of the charged cocaine trafficking offenses, but he appeals only the § 1958 federal murder-for-hire conviction, alleging (1) the government's failure to establish jurisdiction under the murder-for-hire statute and (2) insufficiency of the evidence to establish a nexus between his activity and his use of the cellular telephone.

### PROCEDURAL AND FACTUAL BACKGROUND ·

The proof at trial established that in September 1996, Sergeant Dale Vittitoe of the

---

* The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

Audubon Park (Kentucky) Police Department arrested Weathers and charged him with several state criminal offenses, including trafficking in cocaine, possession of cocaine, possession of a stolen firearm, two counts of carrying a concealed weapon, possession of drug paraphernalia, reckless driving, and speeding. While those state charges were pending, state law enforcement officials made a bargain with Renee Deckard to work as an informant arranging drug deals with Weathers, in return for the release of her boyfriend, Robert Grant, from the Bullitt County jail, where Grant was awaiting trial on a state felony charge. Deckard had purchased cocaine from Weathers some 20 times between December 1995 and February 1996, when she was jailed for shoplifting, and had maintained ties with him. In early October 1996, while Deckard was working with the authorities to arrange the purchase of drugs from Weathers, Weathers asked her whether her boyfriend, Grant, could find someone to kill Sergeant Vittitoe in exchange for money, so that the officer would be unavailable to testify against him in his upcoming state trial.

On October 11, 1996, Detective Dan Peterson of the Kentucky State Police, posing as a drug dealer, drove with Grant and Deckard to meet Weathers to purchase cocaine. While Deckard met with Weathers in his van, Detective Peterson monitored and audio-taped the drug transaction between Deckard and Weathers. The tape-recording of this transaction was played during trial. From it, the jury apparently learned that Weathers again discussed his desire that Grant help him murder Sergeant Vittitoe, stating that he did not want to go to jail and that he would like to be out of town at the time of the murder to avoid connection with the murder. Weathers asked Deckard to find out how much it would cost to have Vittitoe killed and offered to provide the gun.

On October 17, 1996, Deckard met Weathers in a hotel and introduced him to Detective Peterson, who claimed to be a drug dealer willing to murder Sergeant Vittitoe in exchange for cash and drugs. Weathers had previously told Detective Peterson and Deckard to contact him by phone and had given

them his cellular telephone number. Before the meeting, there were several phone calls between Weathers and either Detective Peterson or Deckard. During that meeting, Weathers sold cocaine to the officer and discussed the planned murder of Sergeant Vittitoe. The police videotaped this meeting, and this tape was also played for the jury at trial.

On October 21, 1996, Detective Peterson and Deckard met Weathers again at a hotel in Brooks, Kentucky. There were four telephone calls to and from Weathers before the meeting, each of which was recorded and played for the jury at trial. The first call was made by Detective Peterson to Weathers. The others were made by Deckard in Detective Peterson's presence and at his direction. One audio-taped telephone conversation played for the jury contained a discussion in which Detective Peterson asked Weathers whether he had "something to wrap it in," which Detective Peterson testified referred to the shotgun that Weathers intended to bring to the hotel room that evening and that needed to be hidden upon entry to the hotel.

During the meeting on October 21st, Detective Peterson purchased a small amount of cocaine from Weathers. Weathers also gave Detective Peterson a .410 shotgun and .410 gauge shotgun shells, and the two discussed the planned murder of Sergeant Vittitoe. Detective Peterson testified that by the end of the meeting, he believed that the two had made an agreement that Weathers would pay him $2,500 and two ounces of cocaine in return for the murder of Sergeant Vittitoe. Although Weathers had brought the murder weapon and payment had been discussed, the two had not set a time for the payment or the murder because Weathers's court date on his state charges had been continued. Detective Peterson testified that although the time had not been set for the murder, his understanding was that Weathers intended to have him murder the Sergeant at some point before the trial on his state charges. At the conclusion of the meeting, Weathers was arrested, and police seized several weapons, his cellular telephone, and his pager from him.

Weathers subsequently pleaded guilty to three cocaine distribution charges but went to trial on the § 1958 murder-for-hire and § 924(c) armed drug trafficker counts. At the close of the government's case-in-chief, Weathers moved for a directed verdict on the § 1958 murder-for-hire count, contending that the United States had produced no evidence that any of the telephone calls to or from Weathers and the police officers or Deckard had crossed state lines. Weathers argued that the government's failure to show that the murder-for-hire scheme involved interstate commerce deprived the district court of jurisdiction over the case. After discussion with counsel about the proper interpretation of the interstate commerce requirements of § 1958 and a brief recess, the district court stated that based on its interpretation of the statute, use of the cellular phone would satisfy the interstate commerce element if the search signal for the cellular phone crossed state lines. On the government's motion and over the defendant's objection, the court allowed the government to reopen its case to present evidence about the manner in which Weathers's cellular phone operated.

The United States called an expert witness, Jamie Newman, who was an employee of Bell South Mobility and had received specialized training about the manner in which the Bell South Mobility cellular network operated in the Louisville service area. Newman confirmed that Bell South Mobility provided service to the cellular telephone used by Weathers and that the service for his telephone number allowed for local, long distance, and interstate calls. The local coverage area for Weathers's phone included the metropolitan Louisville area, including southern Indiana. Newman explained that a cellular phone constantly sends out its own radio signal, which is comprised of the cellular telephone number and the electronic serial number, a unique identifier for each cellular telephone. A "cell site" is a place where Bell South Mobility has equipment, such as a tower or antenna, that allows it to receive and transmit signals from cellular phones.

When someone placed a call to Weathers's cellular telephone, the call was routed via trunk lines to the local telephone switching office, known as "METSO." The switching office then sent out a paging signal to search for Weathers's cellular phone. The paging signal was sent out to all of the "cell sites" located in Kentucky and Indiana simultaneously, and those cell sites, in turn, searched for the signal that was being emitted constantly from Weathers's phone. The interstate signal sent out by the switching office did not search for Weathers's cellular phone, but instead searched for a cell site which was receiving the signal from Weathers's phone. Technically, it was searching for that phone's registration, which is composed of the telephone number and the electronic serial number, on a certain cell site. Thus, the defendant's phone could not receive the interstate searching signal; only the cell site could pick up that signal. Once the cell site nearest to Weathers's phone was located, the interstate signal was terminated, and Weathers's phone was ready to receive or transmit telephone calls. Then a new signal was sent to directly connect the caller with Weathers's cellular telephone. Thus, because both Weathers and the various parties who called him were at all times in Kentucky, the final connection made between their telephones was intrastate.

After the government closed its case the second time, Weathers renewed his motion for a judgment of acquittal on the federal murder-for-hire count. He restated the grounds given during his first motion and added as an additional ground that, even if the evidence demonstrated the use of a facility in interstate commerce, that use was "so ephemeral" and "so vaporous as to be virtually non-existent" and, therefore, insufficient to confer jurisdiction on the court. The court denied Weathers's motion then and when it was renewed at the close of all the evidence. The defendant now appeals his ensuing conviction on the murder-for-hire charge.

## DISCUSSION

### I. Jurisdiction

Under 18 U.S.C. § 1958, the use of interstate commerce facilities in the commission of murder-for-hire is a federal offense. Sec-

tion 1958 contained the following provisions at the time of Weathers's arrest:

(a) Whoever travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any *facility in interstate or foreign commerce*, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so, shall be fined under this title or imprisoned for not more than ten years, or both . . . .

18 U.S.C. § 1958 (1996) (emphasis added).[1] But, while the substantive prohibition in § 1958(a) speaks in terms of a "facility *in* interstate commerce," the section that follows it defines "facility *of* interstate commerce" to include "means of transportation and communication." *See* 18 U.S.C. § 1958(b)(2). Unfortunately, it does not otherwise define the term "facility *in* interstate commerce," and the term "facility *of* interstate commerce" does not appear in subsection (a), the substantive provision that spells out the elements of the offense.

The district court struggled mightily to reconcile use of the phrase "facility *in* interstate commerce" in § 1958(a) with use of the phrase "facility *of* interstate commerce" in § 1958(b)(2). Unable to find a case directly in point, the court identified two cases that it considered analogous: *United States v. Paredes*, 950 F.Supp. 584 (S.D.N.Y.1996), and *United States v. Stevens*, 842 F.Supp. 96 (S.D.N.Y.1994). Ultimately, however, these two cases proved less than helpful. Although both involved the question of whether the use of a beeper in furtherance of a murder-for-hire scheme satisfies the interstate commerce requirement of § 1958, the answers produced by the two district courts that decided the cases were in conflict. The court in *Paredes* read § 1958 as prohibiting the "use

[of] a facility in interstate commerce" and, therefore, held that the *intra* state use of the defendant's *inter* state paging system did not satisfy the interstate nexus requirement for jurisdiction over a murder-for-hire charge. *Paredes*, 950 F.Supp. at 586–87, 589–90. Conversely, the court in *Stevens* interpreted the statute as prohibiting any "interstate use of a facility" and held that the *intra* state use of the defendant's *inter* state paging system did satisfy the interstate nexus requirement for jurisdiction over a § 1958 murder-for-hire charge. *Stevens*, 842 F.Supp. at 98.

The district court's initial ruling on the § 1958 issue came in response to the defendant's first motion for judgment of acquittal, resulting in the court's decision to allow the government to reopen its case to attempt to satisfy that interpretation. The district judge indicated that because one section of the statute refers to facilities *in* interstate commerce, whereas another section speaks of facilities *of* interstate commerce, "there are two grammatically cognizable interpretations, one stressing use and the other stressing facility. One stresses how the facility is used under the particular facts, and the other stresses whether the facility itself is a facility of interstate commerce." The district judge then announced his intention to fashion a "hybrid" of the approaches taken in *Paredes* and *Stevens:*

I think that the question that we are presented with is how is the communication facility used under these particular circumstances not with respect to where the call was completed but how the facility itself was used.

In his subsequent ruling on this question, denying Weathers's motion for a judgment of acquittal after the government closed its case for the second time, the district judge noted:

I commented yesterday that if the Court of Appeals or the Supreme Court were to impose a call-completion test, then its clear that the defendant is entitled to dismissal

---

1. Congress amended 18 U.S.C. § 1958 effective October 11, 1996. Pub.L.No. 104–294, 110 Stat. 3500, 3509 (1996). Weathers was arrested on October 21, 1996, but had begun making plans to pay someone to murder Sergeant Vittitoe prior to October 11, 1996. For purposes of this appeal, it

is not material whether the statute as it existed before or after the October 11, 1996 amendments is applied, because the statutory language at issue in this appeal, namely the provisions related to interstate commerce facilities, was not changed by the 1996 amendments.

of the indictment based on the lack of jurisdiction because it is obvious that the call was completed in Kentucky from a Kentucky initiation call.

But I think that the rationale for my decision yesterday is actually somewhat strengthened by this testimony because I had not any information that the cell sites in the towers were actually in Indiana, and my positing was that perhaps when a signal went out, that the search area was conducted by radio waves through the air in Indiana. Now I find that actually Bell South Mobility maintains hardware in southern Indiana that is connected electronically to the ... METSO.... [T]hese cell sites and towers and cell monitoring equipment and hardware are in southern Indiana and [ ] are electronically connected to the METSO, which receives the initial phone call by the land line to the cell system, which in this case is Bell South Mobility.

Then all the sites are checked to determine where in the area, if the cell phone is on, where in the area it might be, including southern Indiana by actually making electronic contact with the hardware that Bell South maintains in southern Indiana.

This strengthens my conclusion that Bell South Mobility, under these particular facts and circumstances, is an interstate communication facility and that the particular use here involves an interstate communication not to complete the phone call but to assess where the cell phone was and if it was on, where and what particular cell site it might be registered.

So I think, based on the nature, the hardware, and the way that the system operates and did on this particular occasion by nature and also by use, as I said yesterday, I think that this was a communication facility usage that was interstate.

■ If we were free to look only to the definition provided in subsection (b)(2), the resolution of this case would be fairly simple. It is well established that telephones, even when used intrastate, constitute instrumentalities *of* interstate commerce. *See Aquionics Acceptance Corp. v. Kollar*, 503 F.2d 1225, 1228 (6th Cir.1974) (holding use of tele-

phone in intrastate service satisfies jurisdictional requirements of § 10(b) of Securities and Exchange Act); *see also United States v. Graham*, 856 F.2d 756 (6th Cir.1988) (holding use of telephone to initiate and receive interstate calls satisfies interstate commerce requirement of Travel Act); *FTC v. Shaffner*, 626 F.2d 32, 37 (7th Cir.1980) (noting defendant's use of telephone constituted use of instrumentality of interstate commerce). Similarly, cellular telephones, even in the absence of evidence that they were used to make interstate calls, have been held to be instrumentalities *of* interstate commerce. *See e.g., United States v. Clayton*, 108 F.3d 1114, 1117 (9th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 233, 139 L.Ed.2d 165 (1997) (holding cellular telephones to be instrumentalities of interstate commerce).

Nevertheless, it is clear from prior decisions of this court that the distinction between "in" and "of" interstate commerce, at least when used in two different statutes, is critical. *See, e.g., Aquionics Acceptance Corp.*, 503 F.2d at 1228. It also appears that the two phrases, "facility in interstate commerce" and "facility of interstate commerce," encompass different categories of activity, both of which Congress intended to regulate. In interpreting the Travel Act, 18 U.S.C. § 1952, of which the current murder-for-hire statute was originally a subset, we have previously discussed the significance of the use of the phrase "instrumentality *in* interstate commerce" in the Travel Act, as opposed to other statutes that speak in terms of an "instrumentality *of* interstate commerce," and concluded that "a statute that speaks in terms of an instrumentality *in* interstate commerce rather than an instrumentality *of* interstate commerce is intended to apply to interstate activities only." *United States v. Barry*, 888 F.2d 1092, 1095 (6th Cir.1989). For this reason, we must reject the district court's attempt to reconcile the differences in the wording of § 1958(a) and (b)(2) by integrating them to apply to a single category of activities.

This conclusion is bolstered by the Supreme Court's recent exegesis of the Commerce Clause in *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626

(1995). There, the Court held that in passing the Gun–Free School Zones Act of 1990, which made the possession of a gun in a school zone a federal offense, Congress exceeded its authority under the Commerce Clause. After considering its prior interstate commerce jurisprudence, the Court identified three broad categories of activity that Congress may regulate under the Commerce Clause: (1) the use of the channels of interstate commerce; (2) the instrumentalities of interstate commerce; and (3) activities that have a substantial effect on interstate commerce. *See id.* at 558–59, 115 S.Ct. 1624. Hence, we conclude that the phrase "facility *in* interstate commerce" is best interpreted as Congress's attempt to regulate the use of the channels of interstate commerce and the phrase "facility *of* interstate commerce" as an attempt to regulate the instrumentalities of interstate commerce, as those categories are delineated in *Lopez.* Hence, there is no contradiction between the two phrases; they encompass two separate, although potentially overlapping, categories of activity that were identified by the Court in *Lopez* as categories that Congress could regulate under the Commerce Clause.

■ Yet, the problem of divining the correct interpretation of § 1958 remains, because we have before us not the use of the two phrases in question in two different statutes, but in separate subsections of the same statute, in a manner that might otherwise indicate that they were intended to be used interchangeably. Given that this cannot be the case, we conclude that the key prohibition creating the criminal offense is found in subsection (a) and that it controls over the provision in subsection (b), which, after all, merely defines an otherwise non-existent term. Hence, in order to establish the court's jurisdiction under § 1958, the government must show that the defendant used a "facility *in* interstate commerce." We are then left with the question of whether that requirement has been met here. Under the particular facts of this case, we conclude that it has.

■ In deciding this issue, we focus on the evidence regarding the technical aspects of the operation of Weathers's cellular telephone, and the legal consequences flow therefrom. *Cf. FPC v. Florida Power & Light Co.,* 404 U.S. 453, 92 S.Ct. 637, 30 L.Ed.2d 600 (1972), in which the United States Supreme Court emphasized that legal conclusions may depend upon the evaluation of technical facts. That case turned on the Federal Power Commission's finding that energy from the state power company was transferred into a "bus," the point of connection between several regional utilities where energy from all of them is commingled, before it was sent to various out-of-state destinations. The Court held that this transfer and the commingling were sufficient to satisfy the interstate commerce requirements for the Commission's jurisdiction. *Id.* at 463, 92 S.Ct. 637.

In this case, the defendant has never disputed evidence that he used a cellular telephone to communicate with Detective Peterson and Deckard. As the district court found, it is clear from the testimony about the manner in which Weathers's cellular phone operated that Bell South Mobility was required to engage in interstate activities by sending a search signal to communications equipment in another state to locate Weathers's cellular telephone. Without that interstate search, the transmission of a telephone call to or from Weathers's cellular telephone would not have been possible. Thus, even though the signal that actually connected the two parties was ultimately *intra* state, *inter* state activities were required to make that connection possible. Hence, we conclude that the defendant's use of his cellular telephone was use of an instrumentality *in* interstate commerce. Accordingly, we conclude that the government established a factual basis for the court's jurisdiction under § 1958(a).

We would be remiss, however, if we failed to point out that the intent of Congress, as expressed in the inconsistent provisions in § 1958(a) and (b)(2), is far from clear.[2]

---

**2.** We have opted in this case to follow the plain language of § 1958(a) and, thus, we need not look to the intent of Congress in passing the murder-for-hire statute. However, if we were to conclude instead that the conflicting terms used in subsections (a) and (b)(2) create an ambiguity,

Moreover, this lack of clarity has not only made resolution of the instant case unnecessarily difficult, but will pose even thornier questions as communications that appear to be carried on *intra* state are increasingly transmitted by satellite and other obviously "interstate" facilities. We can only express the hope that future amendments to the statute will obviate our current difficulty.

## II. Sufficiency of the Evidence

█ Weathers contends that even if his use of the cellular telephone constitutes use of a facility in interstate commerce, that use was too tenuous and incidental to the murder-for hire scheme to justify application of the statute. In support of this argument, he quotes our decision in *United States v. O'Dell,* 671 F.2d 191 (6th Cir.1982):

> Thus, in construing the Travel Act in the present case, we keep in mind two important factors from *Rewis* [*v. United States,* 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971)]. First, the Travel Act is not aimed at local criminal activity; rather, its purpose is to attack crime that has true interstate aspects. Second, courts must be careful not to read the language of the Act so broadly as to have consequences that go beyond congressional intent. The determination whether federal jurisdiction under the Travel Act extends to cover given criminal activity depends on the facts of each individual case rather than a broad rule of law. If the nexus between a defendant's criminal activity and interstate travel or commerce becomes too tenuous or indirect, an application of the Act to that activity would be beyond the intent of Congress.

*Id.* at 193 (concluding that defendants' placing of advertisements for their massage parlors in which a prostitution business was operated in Louisville newspapers, some copies of which were sent to Indiana without the request of defendants, did not provide necessary jurisdictional basis for federal criminal convictions under Travel Act).

As noted in the previous section of this opinion, we conclude that the plain language of the statute reveals Congress's intent to proscribe murder-for-hire when the defendant uses facilities in interstate commerce. Accordingly, this court's decision that Weathers's use of the cellular telephone involves the use of facilities in interstate commerce is a faithful interpretation of those activities Congress intended to regulate, as *O'Dell* admonishes us to ensure.

But having established that use of Weathers's cellular telephone involved interstate commerce, we must also ensure that the nexus between the cellular telephone use and the criminal activity is sufficient to support a conviction under § 1958. As this court has previously held, telephone communications "need not be an essential element of the scheme but need only facilitate or further the unlawful activity." *United States v. Graham,* 856 F.2d 756, 760 (6th Cir.1988) (finding interstate telephone calls sufficient to support defendant's convictions under the Travel Act, 18 U.S.C. § 1952(a)(3)). The evidence presented to the jury established that several of the telephone communications involving the defendant's cellular telephone served to facilitate and further his planning of the murder-for-hire scheme.

The district court expressly held that all four of the telephone conversations on October 21, 1996, related to the murder-for-hire:

> I have no problem with the notion that the telephone conversations of October 21, 1996—in fact I would hold all of them, even the ones numbered 2 and 4, were under the circumstances of this case shown with an intent that murder be committed because even those conversations that didn't mention the gun or the murder-for-hire scheme were for the purpose of bringing Mr. Weathers together with Agent Peterson for the purpose of delivering the gun and the shells and discussions as well

a study of Congressional intent would not be helpful to an interpretation of the statute, because the legislative history is as confused and confusing as the statute itself. For example, a 1983 Senate report discussing the statute uses the phrases "facility *in* interstate commerce" and "facility *of* interstate commerce" interchangeably, generally employing the latter in discussing the scope of the statute. *See* S. Rep. No. 98–225, at 305–06 (1984), reported in 1984 U.S.C.C.A.N 3182, 3484–85.

**344**

as dealing some additional drugs on that day at the motel, at the Holiday Inn Express in Bullitt County, Brooks, Kentucky. I have no problem with that.

These specific findings of fact are not clearly erroneous and we, therefore, must defer to the district court's determination with regard to those findings. *See United States v. Charles,* 138 F.3d 257, 262 (6th Cir.1998).

The telephone conversations of October 17, 1996, were also related to the murder-for-hire because they were necessary to arrange a meeting for a drug transaction later that day, and that meeting also involved planning and discussion about the murder. Although Weathers protests that the government stipulated that the calls were for the purpose of making arrangements for a drug transaction, the stipulation does not state that the calls were "solely" related to the drug transaction. Hence, the stipulation does not change the fact that the telephone calls led to the meeting where the murder-for-hire was also planned.

Weathers's participation in numerous telephone conversations via cellular telephone served to facilitate and further the planning of his murder-for-hire scheme. Accordingly, we conclude that the evidence before the jury demonstrated a legally sufficient nexus between the cellular telephone use and the defendant's murder-for-hire scheme, thereby satisfying the jurisdictional basis for conviction under § 1958(a).

## CONCLUSION

For the reasons set out above, we conclude that the district court properly exercised jurisdiction in this case and that the evidence was legally sufficient to support the defendant's conviction under 18 U.S.C. § 1958(a). We therefore **AFFIRM** the judgment of the district court.