**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Keith Wai Keung NG, also known as Keith Eng, Defendant–Appellant.**

**No. 00–2098.**

United States Court of Appeals, Sixth Circuit.

Dec. 18, 2001.

Before GUY and BOGGS, Circuit Judges; and CARR, District Judge.*

PER CURIAM.

Defendant, Keith Wai Keung Ng, a/k/a Keith Eng, appeals his conviction and sentence on three counts of using interstate commerce facilities with intent to commit a murder-for-hire in violation of 18 U.S.C. § 1958. Challenging his convictions, Ng argues (1) that the district court abused its discretion in denying his motion to consolidate counts as multiplicitous, and (2) that the facts establish entrapment as a matter of law. With respect to sentencing, defendant claims he should have been awarded

a two-level reduction in the offense level for acceptance of responsibility and a downward departure on the grounds of imperfect entrapment. Finally, defendant claims he was denied effective assistance of counsel as a result of the failure to move for a new trial based on newly discovered evidence. After review of the record and the arguments presented on appeal, we affirm defendant's convictions and sentence.

## I.

The charges arose out of numerous conversations and two face-to-face meetings between Ng and Donald DeClercq, during which Ng allegedly arranged to pay De-Clercq to murder Dr. So Tang. Ng was arrested on June 23, 1999, after giving DeClercq a down payment of $4,000 in cash, four pictures of Dr. Tang, and a note with Dr. Tang's name and address. Ng claimed he was entrapped by DeClercq, who was cooperating with the FBI. Ng was convicted by a jury on three counts of violating the federal murder-for-hire statute. The indictment alleged: (1) that Ng traveled from California to Michigan on or about December 12, 1998, with intent that the murder of Dr. Tang be committed for $100,000; (2) that Ng caused DeClercq to travel from Michigan to California on June 22, 1999, with intent that the murder of Dr. Tang be committed for $30,000; and (3) that from October 27, 1998, through June 23, 1999, Ng used a facility in interstate commerce (the telephone) with intent that the murder of Dr. Tang be committed as consideration for something of pecuniary value.

Keith Ng became acquainted with Dr. Tang, an anesthesiologist, and his wife,

* The Honorable James G. Carr, United States District Judge for the Northern District of Ohio, sitting by designation.

Hsin–Ming Tang, while working as a general contractor in the construction of their house and a medical office building in San Marino, California. In 1988, Ng and the Tangs invested in a vineyard located in Santa Maria, California. The Tangs held the deed, but orally guaranteed Ng a twenty-percent share. Ng moved to Santa Maria to run the vineyard. Dr. Tang discovered that his wife was having an affair with Ng. In 1996, the vineyard, along with other property, was conveyed to the Tangs' two children. At that time, Ng was promised that his interest would be honored. Mrs. Tang, who was separated from her husband, filed for divorce. In 1997, Dr. Tang filed a lawsuit seeking to set aside the property transfers as fraudulent.

Ng and Hsin Tang traveled to Michigan more than once to help her son, George Tang, who had started his medical residency training in the Detroit area. During a visit in July 1998, George's neighbor, Larry Campbell, took Ng to several antique and pawn shops to look for watches and introduced him to DeClercq. After discussing their mutual interest in watch collecting, DeClercq arranged for Ng to come to his home located in Bloomfield, Michigan, from which he operated a business called DeClercq's Watches. Within a few days, Ng had visited DeClercq twice and purchased two expensive watches. Ng paid DeClercq $8,000 in cash and gave him a $4,000 check written to "cash."

During one visit, DeClercq and Ng spent an hour or two talking. According to DeClercq, Ng said he ran a vineyard and was "having a problem" with someone who had lent him $250,000 to open the vineyard. Ng said this person was demanding $5 million to release a lien that was clouding title to the property and making it difficult to borrow money to keep the business going. Ng told DeClercq, "I would pay $100,000 just to make

sure this person went to Mexico and never returned." Ng seemed serious and, when questioned further, Ng offered to pay $100,000; $50,000 down and $50,000 when the problem went away. DeClercq asked if he wanted this man murdered, and Ng answered that he wanted this problem to "go away." DeClercq was suspicious, but told Ng he would look into it.

Ng offered a different version of this meeting. Ng testified that he went to DeClercq's house to pay for the watches, and DeClercq showed him around. DeClercq also showed him a stack of pictures of naked women and asked him to pick one, but Ng was not interested. When Ng told DeClercq he owned a vineyard, DeClercq said he had friends in South America with money to invest in legitimate businesses. Ng said he was not interested in a partner because he had his own problems with a lawsuit pending, liens on the property, and loans to pay. That, Ng claimed, was when DeClercq offered to "fix [his] problem" and make it disappear like Jimmy Hoffa. Ng didn't know who Jimmy Hoffa was, so DeClercq told him to rent a movie called "The Jackal" or one called "The Mechanic." Although shocked by this discussion, Ng testified that he remained calm and stayed for a few drinks. Ng came back a few days later to have his Rolex fixed and to see a watch DeClercq wanted to sell for $80,000. Ng did not buy the watch and returned to California shortly thereafter.

DeClercq, who was under criminal investigation by the IRS, went to see his attorney. Concerned that the solicitation could be "a set up," they also recognized that it might be an opportunity to improve his situation with the IRS. Inquiries made through the United States Attorney's Office led to an interview with FBI Agent Joseph Callahan on October 27, 1998. DeClercq thought it was possible that Camp-

bell might have told Ng that DeClercq was connected to the mafia. Callahan decided to monitor a call from DeClercq's home to Ng's cellular telephone in California the same day.

At the outset of the conversation on October 27, DeClercq asked Ng: "You still have that problem?" Ng replied: "Yep ... I don't know which way to turn." After discussing Ng's travel plans. De-Clercq told him he should be in Texas when "things happen" and explained that "[i]n other words, you know, ... the best time for the house to burn down is when you're on vacation." Ng said "[y]eah." "I know," "I, be, I be in Paris." When De-Clercq asked for the person's name, Ng responded: "No I don't wanna talk on the phone ... [s]omebody may listen to the phone."

On November 5, 1998, at Callahan's direction, DeClercq asked Ng to put together a package including photographs, a description of the car, and background information about the intended victim to bring to a face-to-face meeting in Michigan. Ng responded: "[N]o problem I have all that, I have all that in my folders ... I been follow this tail for long time." They agreed to talk in a few days.

When DeClercq called Ng on November 16, Ng told him he had purchased a telephone card so that his calls to DeClercq could not be discovered. Ng invited De-Clercq to fly to California to "get a, visual inspection you know?" DeClercq said he would think about it, and they then discussed a watch Ng was interested in buying.

Ng called DeClercq back the next day and asked him to come to California and said, "I mean the, the, the merchandise is here, if you want to look at it." They talked about their schedules and DeClercq asked, "when do you want this watch stopped?" Ng answered: "Anytime.

Sooner the better." At Callahan's direction, DeClercq attempted to arrange for their meeting to take place in Detroit. DeClercq asked for the name of the lender for the vineyard. Ng responded that he'd gotten an extension for a couple of months, but that "this is on the way, so you clean the title for me."

On December 11, 1998, Ng flew from California to Michigan to meet DeClercq in person. At Callahan's direction, De-Clercq arranged to meet Ng in a hotel room in Troy, Michigan, at noon on December 14, 1998. The meeting was recorded and videotaped. After they discussed watches for a while, DeClercq brought up the "other thing." Ng looked around and asked about "cameras." Ng told DeClercq to talk in simple terms "in case somebody had a tape on it." De-Clercq asked Ng if he was sure he wanted to do this. Ng immediately answered "yes" and said he had "no choice."

During their meeting, Ng agreed to pay $100,000, with a $25,000 down payment. Although DeClercq asked Ng how he wanted it to happen, Ng made it clear he did not want to know. When DeClercq asked for the package of information, Ng assured him that he had everything ready and would give it to him with the down payment. They agreed to do it after the holidays, when Ng had the money ready. Ng also talked about the need to pay for Buddhist monks to pray to be sure the spirit would be at peace so it would not bother them.

During several calls in January 1999, Ng told DeClercq he was ready to "get it done and over with." On January 13, Ng told DeClercq that "the main thing is I'm ready, and the money's ready, everything is ready." Ng wanted it done by the end of January, and DeClercq agreed to go to Los Angeles within the next ten days. Ng

planned to meet DeClercq, show him where the victim lived, and then leave town. The FBI decided to delay the meeting to try to determine the identity of the intended victim. As a result, DeClercq called Ng on January 19, and put off his trip to Los Angeles. Ng said he'd like to "get it done" by the end of February.

Ng called DeClercq during the first week of February and said he had someone else who could possibly take care of it for a much lower price, but didn't trust him. DeClercq called Ng on February 17, 1999, and they arranged that Ng would call DeClercq on March 22 and they would do it that week. Around this time, DeClercq sent Ng a watch he thought he might buy. The watch was returned to DeClercq. When Ng did not call as expected, DeClercq called and left four messages for Ng between March 29 and April 7, 1999. At that point, Callahan felt the case was slipping away and told DeClercq not to call Ng.

In June 1999, DeClercq was in Las Vegas to attend a huge watch show. DeClercq, who was calling his previous customers, made an unmonitored call to Ng on June 14. DeClercq asked Ng about his problem, and Ng told him that he had hired someone else for $50,000 but that the guy just took his money and left town. As a result, Ng said he could no longer afford to pay $100,000. They renegotiated the price and Ng agreed to pay $30,000, with $5,000 down. Callahan had DeClercq make a monitored call to Ng on June 16 to rehash their last conversation. Ng said he had paid someone else, who did not do the job. Ng wanted DeClerq to take care of the problem for $30,000, paying $5,000 down and the rest "on completion of the job." They agreed that DeClercq would come to Los Angeles the following week.

On June 22, 1999, DeClercq, accompanied by Callahan, flew from Detroit, Michi-gan, to Los Angeles, California. Once in Los Angeles, DeClercq called Ng and arranged to meet him outside a Denny's restaurant the next morning. DeClercq wore a recording device and the meeting was videotaped. When DeClercq got into Ng's Cadillac, Ng patted him down. Ng gave DeClercq the address of Dr. Tang's office and explained that Tang lived in one of the back rooms. Even then, Ng would not say Dr. Tang's name until DeClercq insisted so he could be sure he "got the right guy." DeClercq was unable to get Ng to identify the person he said he had hired, despite offering to get his money back for him. Ng gave DeClercq $4,000 in cash, and they agreed DeClercq would get $26,000 when he had pictures of the murdered Dr. Tang. DeClercq asked Ng how he wanted it done. Ng volunteered that Dr. Tang had a heart condition and said "[y]ou can turn on the gas and blow the whole f-ing house … I don't care … you can choke him … no air's the best." After DeClercq left the car, FBI agents arrested Ng.

Defendant filed a pretrial motion to consolidate the charges as multiplicitous, which was denied. At the conclusion of trial, the jury found defendant guilty of all three counts. Defendant was sentenced to 120 months' imprisonment on count one, to be followed by concurrent one-month terms of imprisonment on counts two and three. Defendant was also sentenced to three years of supervised release. This appeal followed.

## II.

### A. Entrapment as a Matter of Law

 Defendant argues that his convictions should be reversed because the facts establish entrapment as a matter of law. There are two related elements to a valid entrapment defense; government in-

ducement of the crime and a lack of pre-disposition on the part of the defendant. *Mathews v. United States,* 485 U.S. 58, 63, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988). *See also Jacobson v. United States,* 503 U.S. 540, 548, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992). Predisposition "focuses upon whether the defendant was an 'unwary innocent' or, instead, an 'unwary criminal' who readily availed himself of the opportu-nity to perpetrate the crime." *Mathews,* 485 U.S. at 63 (citations omitted). "It is only when the Government's deception ac-tually implants the criminal design in the mind of the defendant that the defense of entrapment comes into play." *United States v. Russell,* 411 U.S. 423, 436, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973).

■ Entrapment is generally an issue for the jury, not the court. *United States v. Barger,* 931 F.2d 359, 366 (6th Cir.1991). In order to succeed on a claim of entrap-ment as a matter of law,

> the testimony and facts must be undis-puted; a court may not choose between conflicting testimony or make credibility determinations. Furthermore, the un-disputed evidence must demonstrate a "patently clear" absence of predisposi-tion. If either of these elements is miss-ing, then the predisposition question is for the jury to decide.

*United States v. Pennell,* 737 F.2d 521, 534 (6th Cir.1984) (citations omitted). Once entrapment is placed in issue, the govern-ment must prove beyond a reasonable doubt that the defendant was predisposed to commit the offense. *See United States v. Johnson,* 855 F.2d 299, 303 (6th Cir. 1988). In determining whether the evi-dence was insufficient as a matter of law to

establish predisposition, we must view the evidence and draw all inferences in the light most favorable to the prosecution. *Barger,* 931 F.2d at 366 (quoting *United States v. McLernon,* 746 F.2d 1098, 1111 (6th Cir.1984)).[1]

■ "Predisposition" means the de-fendant's state of mind before coming into contact with government agents. *See McLernon,* 746 F.2d at 1112. Several fac-tors are relevant to this determination: the defendant's character and reputation, including any criminal record; whether the suggestion of criminal activity was initially made by the government or the defendant; whether the defendant was engaged in the criminal activity for profit; whether the defendant was reluctant to commit the of-fense and overcome only by repeated gov-ernment inducement or persuasion; and the nature of the government's inducement or persuasion. *Id. See also Barger,* 931 F.2d at 366.

■ Applying these factors, Ng argues that it is clear he was not predisposed to commit the offenses. There was no evi-dence that Ng had a criminal record. Sev-eral witnesses who testified about his char-acter described Ng as honest, kind, gentle, easy going, and not quick to anger. Even George Tang testified that it was out of character for Ng to try to arrange a con-tract killing. However, defendant con-cedes, as he must, that the evidence was disputed concerning whether he or De-Clercq was the first to suggest killing Dr. Tang. But, there is no dispute that Ng stood to benefit from Dr. Tang's death as it would clear title to the vineyard.

Ng relies heavily on the factor that we have described as being the most impor-

---

1. The government argues that because defen-dant did not move for judgment of acquittal under Fed.R.Crim.P. 29 at the close of the evidence, we may only review the sufficiency of the evidence for plain error resulting in "manifest miscarriage of justice." *See United States v. Price,* 134 F.3d 340, 350 (6th Cir. 1998); *United States v. Cox,* 957 F.2d 264, 265 (6th Cir.1992). Since there was no error, there also was no plain error.

tant in determining the lack of predisposition as a matter of law—whether the defendant demonstrated reluctance to engage in the criminal activity that was overcome by repeated government inducement or persuasion. *McLernon*, 746 F.2d at 1113. Claiming that DeClercq pursued him relentlessly until he finally succumbed to the pressure, Ng emphasizes that it took eleven months for Ng finally to give DeClercq the intended victim's name and a down payment for the murder. Ng states that there were apparently no conversations between July and October 1998. The telephone records, however, indicate that not only were there calls between them, but also that two of the calls were initiated by Ng.

At no time was Ng heard to express doubts about going ahead with the murder. In fact, the only reluctance Ng actually expressed was reluctance to talk about their plans over the telephone in anything but oblique terms. Concerned that someone might be listening or watching, Ng nonetheless repeatedly assured DeClercq that he "was ready." In November 1998, Ng invited DeClercq to come to California for "a visual inspection" of the "merchandise" and indicated that the sooner the "watch was stopped" the better. During the December meeting, Ng agreed on a price and decided to have DeClercq do it after the holidays. Nor did their conversations in January suggest either reluctance or government inducements to go forward. Although DeClercq made an unmonitored call to Ng on December 29, no evidence was offered concerning the content of that conversation.

Finally, Ng claims that a lack of predisposition can be inferred from his failure to call DeClercq in March or return the four messages DeClercq left for him. Ng testified that he did not contact DeClercq because he did not want to go forward with

the murder. Ng denied having actually hired someone else during that time, and claimed to have made up the story to put DeClercq off. Ng emphasizes that DeClercq found himself in more trouble and had a greater interest in seeing the plan go forward after he was arrested on March 20, 1999, for theft and charged with being a habitual offender. Although DeClercq was certainly trying to help himself by cooperating with the FBI, he did not try to contact Ng between the first week of April and mid-June. When taken in the light most favorable to the prosecution, a rational trier of fact could conclude that Ng did not contact DeClercq for several months because he had arranged for someone else to do the job for less, did not have the money to pay DeClercq, or wanted to get DeClercq to do it for less.

Maybe Ng would not have brought DeClercq to Los Angeles if DeClercq had not called him on June 14. Yet, Ng did not claim that DeClercq had offered inducements, exerted pressure, or made threats that caused Ng to go forward with the murder in June 1999. The evidence concerning predisposition was clearly disputed and the jury's conclusion rested in large part on the jury's credibility determinations. Therefore, we cannot find entrapment as a matter of law and the issue was properly submitted to the jury. Further, we find that when the evidence and inferences are taken in the light most favorable to the prosecution, a reasonable juror could find defendant was predisposed to commit the offenses beyond a reasonable doubt.

## B. Multiplicitous Counts

 The district court denied defendant's motion to consolidate the three counts as multiplicitous. Defendant maintains that the indictment was multiplicitous because it actually charged a single offense

in several counts. Multiple charges put the defendant in jeopardy of multiple sentences for a single offense and may suggest to the jury that he committed not one but several offenses. *See Ball v. United States,* 470 U.S. 856, 867–68, 105 S.Ct. 1668, 84 L.Ed.2d 740 (1985); *United States v. Duncan,* 850 F.2d 1104, 1108 n. 4 (6th Cir.1988). We review for abuse of discretion the district court's decision whether to require the prosecution to elect between multiplicitous counts. *United States v. Throneburg,* 921 F.2d 654, 657 (6th Cir. 1990). The remedy for multiplicitous prosecutions and convictions is for the sentencing court to vacate or merge any multiplicitous counts. *Id.* (quoting *Ball,* 470 U.S. at 864).

Defendant was charged with three violations of the federal murder-for-hire statute, which provides in pertinent part:

> Whoever travels in or causes another … to travel in interstate or foreign commerce, or uses or causes another … to use … any facility in interstate or foreign commerce, with intent that a murder be committed … as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so, shall be fined … or imprisoned for not more than ten years, or both[.]

18 U.S.C. § 1958. Applying the *Blockburger* test, the district court concluded that the charges did not violate double jeopardy because they each involved proof of facts not required by the others: namely, defendant's own interstate travel, defendant's having caused DeClercq to travel interstate, and defendant's use of an interstate communication facility in the murder-for-hire scheme. *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932); *See also Murr v. United*

*States,* 200 F.3d 895 (6th Cir.2000) (same elements test).

The district court also rejected defendant's claim that the government had impermissibly divided a single offense into several counts, finding that this case could not be distinguished from *United States v. Snelenberger,* 24 F.3d 799, 803 (6th Cir. 1994). In *Snelenberger,* the defendant was charged separately with threats he made against a magistrate judge to two different people at two different places in the course of being involuntarily hospitalized.

Defendant argues that the statute is intended to punish, as a unit of prosecution, the hiring of someone to kill another person. Since it was charged in each count that he intended for DeClercq to murder Dr. Tang, defendant argues there was only one offense. The proscribed conduct, however, is traveling or causing another to travel in interstate commerce, or using or causing another to use facilities of interstate commerce, with intent that a murder-for-hire be committed. *See United States v. Ransbottom,* 914 F.2d 743, 746 (6th Cir. 1990). Relying on two Sixth Circuit decisions, defendant argues that the element of interstate travel or use of facilities of interstate commerce are nothing more than "jurisdictional requirements." *See United States v. Weathers,* 169 F.3d 336 (6th Cir.1999); *United States v. Winters,* 33 F.3d 720 (6th Cir.1994). Defendant's reliance on these cases is misplaced.

In *Weathers,* the court was faced with the question of whether the intrastate use of a facility of interstate commerce would satisfy the jurisdictional requirement of § 1958. Concluding that the facility must have been used in interstate commerce, the court described the "substantive prohibition" of the offense as the use of a "facility in interstate commerce" with intent that a murder-for-hire be committed. The court was not asked to decide whether

more than one offense could be committed as part of a scheme to commit a murder-for-hire.

■ Examination of the decision in *Winters* makes clear that defendant misapprehends the significance of the jurisdictional element. In that case, the defendants were charged with using or causing another to use the mails with intent to commit murder-for-hire in violation of § 1958. The defendants argued that the government must prove that they intended that the mails be used, not just that they intended that a murder-for-hire be committed. In rejecting this claim, the court held that "there is no intent requirement with respect to the use of the mails and that this element of the crime is jurisdictional in nature." 33 F.3d at 721. The court then took care to note that

[t]he significance of labeling a statutory requirement as "jurisdictional" is not that the requirement is viewed as outside the scope of the evil Congress intended to forestall, but merely that the existence of the fact that confers federal jurisdiction need not be one in the mind of the actor at the time he perpetrates the act made criminal by the federal statute.

*Id.* at n. 1 (internal quotations omitted) (quoting *United States v. Feola*, 420 U.S. 671, 676–77 n. 9, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975)). The plain language of the statute makes clear that the evil it intended to proscribe was the interstate travel and use of facilities in interstate commerce with intent that a murder-for-hire be committed. The defendant's own travel from California to Michigan in December 1998 was a separate offense from his causing DeClercq to travel from Michigan to California in June 1999, even though they were committed as part of an ongoing scheme to commit murder-for-hire. Further, the defendant's use of a facility in interstate commerce between October 1998 and June 1999 was properly charged as a separate offense.

## C. Sentencing

■ Defendant argues that the district court erred by denying his request for a two-level reduction in his offense level for acceptance of responsibility. U.S. SENTENCING GUIDELINES MANUAL (USSG) § 3E1.1(a). We review the district court's determination regarding acceptance of responsibility for clear error. *United States v. Mahan*, 190 F.3d 416, 418 (6th Cir.1999). Generally, the reduction for acceptance of responsibility is not intended to apply to a defendant who denies the factual elements of guilt at trial and only admits guilt and expresses remorse after he is convicted. *United States v. Hill*, 167 F.3d 1055, 1071 (6th Cir.1999).

■ The district court recognized that defendant's assertion of an entrapment defense at trial did not necessarily preclude a reduction under § 3E1.1(a). *United States v. Fleener*, 900 F.2d 914, 918 (6th Cir.1990). At the same time, "*Fleener* does not stand for the proposition that all defendants who go to trial and assert entrapment are entitled to receive the reduction for acceptance of responsibility. Rather, *Fleener* holds that such a reduction is not *per se* unavailable[.]" *United States v. Hernandez*, 31 F.3d 354, 361 (6th Cir.1994). Defendant relied on the statements he made at the time of his arrest: "I understand. I made a mistake. I'm going to cooperate." After exercising his right to counsel, however, Ng chose not to make a statement. In *Fleener*, the reduction was specifically tied to the defendant's voluntary cooperation in providing evidence to the government. Here, the district court heard the testimony, noted that the jury disbelieved Ng, and concluded that the reduction was not warranted in

this case. We find no clear error in this regard.

 Defendant also sought a downward departure from the guideline range of 121 to 151 months' imprisonment on the grounds of "imperfect entrapment." *See United States v. Coleman*, 188 F.3d 354, 358–59 & n. 3 (6th Cir.1999) (*en banc*) (improper government action is permissible basis for downward departure). The refusal to depart downward is not reviewable on appeal unless the district court did not recognize that it had the discretion to do so. *United States v. Prince*, 214 F.3d 740, 766 (6th Cir.), *cert. denied*, 531 U.S. 974, 121 S.Ct. 417, 148 L.Ed.2d 322 (2000).

It is clear from our review of the arguments and the district court's ruling on the issue that the district court considered the actions of the government agent as a possible basis for downward departure, but found such a departure was not warranted on the facts. The district court noted that the inducements were nothing more than telephone calls, found that it was not improper for DeClercq to have initiated contact with Ng, and concluded as follows:

> So the real reason that I think it inappropriate to depart is, as I have said, this is not conduct outside the heartland and to the extent that I do agree with [defense counsel] there was an element [or] aspect of ambivalence or reluctance on Mr. Ng's part at different points of this series of events, I do think that can be accounted for within the established guideline range and no departure would be necessary for that.

Since there is no indication that the district court believed that it lacked discretion to depart downward, we have no jurisdiction to review this claim of error.

## D. Ineffective Assistance of Counsel

Defendant claims he was denied effective assistance of counsel when his attorneys failed to move for a new trial under Fed.R.Crim.P. 33, on the grounds of newly discovered evidence of wrongdoing by DeClercq. A claim of ineffective assistance of counsel is ordinarily not reviewed on direct appeal because of the lack of an adequate factual record. *United States v. Tucker*, 90 F.3d 1135, 1143 (6th Cir.1996). Instead, these claims are more properly brought in a post-conviction proceeding under 28 U.S.C. § 2255. *Id. See also United States v. Aguwa*, 123 F.3d 418, 423 (6th Cir.1997). Only if the record is sufficiently developed to allow the court to evaluate counsel's performance, will this court consider an ineffective assistance claim on direct appeal. *See United States v. Snow*, 48 F.3d 198, 199 (6th Cir.1995).

Defendant relies on newly discovered evidence that DeClercq was alleged to have attempted to bribe a police officer. DeClercq was facing charges of retail fraud, which was known at the time of trial and used to impeach DeClercq's credibility. DeClercq allegedly approached an officer on March 13, 2000, shortly before testifying in defendant's trial, and asked the officer to make the stolen property disappear from the police station. Because the facts concerning the alleged bribery charge have not been developed in the record, we decline to review defendant's claim of ineffective assistance of counsel.[2]

**AFFIRMED.**

---

2. We do note, however, that a motion for new trial on the grounds of newly discovered evi-

dence will not be granted unless all four of the following requirements are met: (1) the new evidence was discovered after trial; (2) the evidence could not have been discovered earlier with due diligence; (3) the evidence is material and not merely cumulative or impeaching; and (4) the evidence would likely produce an acquittal. *United States v. Barlow*, 693 F.2d 954, 966 (6th Cir.1982). The government argues that this evidence was not material, but was merely cumulative impeachment evidence that would not likely produce an acquittal. Although not entirely clear, it seems that DeClercq was being investigated for attempted bribery at the time of defendant's trial, but had not yet been charged.