**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Richard Timrod DORMAN, Charles
Louis Stewart, Defendants–
Appellants.**

Nos. 02–5127, 02–5182.

United States Court of Appeals,
Sixth Circuit.

Decided July 16, 2004.

Rehearing Denied Aug. 19, 2004.

Rehearing En Banc Denied Oct. 28, 2004.

Terry M. Cushing, Asst. U.S. Attorney, John L. Caudill, Asst. U.S. Attorney, James R. Lesousky, Jr., Asst. U.S. Attorney, Office of The U.S. Attorney, Louisville, KY, for Plaintiff–Appellee.

Allen W. Holbrook, Sullivan, Mountjoy, Stainback & Miller, Owensboro, KY, Kevin M. McNally, McNally & O'Donnell, Frankfort, KY, for Defendants–Appellants.

Before: NORRIS and COLE, Circuit Judges; and ECONOMUS, District Judge.*

* The Honorable Peter C. Economus, United States District Judge for the Northern District of Ohio, sitting by designation.

## OPINION

ALAN E. NORRIS, Circuit Judge.

Defendants Richard Dorman and Charles Stewart appeal the life sentences imposed after a jury convicted each of them of conspiracy to commit murder for hire, 18 U.S.C. § 1958, aiding and abetting bank fraud, 18 U.S.C. § 1344, and, with respect to Stewart, aiding and abetting murder for hire. On appeal, they raise numerous issues, ranging from the sufficiency of the evidence against them to the constitutionality of the federal murder for hire statute. For the reasons that follow, we affirm their convictions and sentences.

## I.

Stewart and Dorman were prosecuted for conspiring to hire co-defendant Billy Joe Lyon and his father, Larry Lyon, to kill at least two individuals. After Billy Joe and his father murdered Jack Norris and James Nichols in separate incidents, Dorman and Stewart stole the victims' assets. With respect to Norris, the theft involved bank fraud.[1] Because Stewart and Dorman were tried separately, and the conspiracy involved a number of individuals and crimes, a recitation of the events giving rise to their prosecutions would of necessity be lengthy. Given that we have elected to designate this opinion as not for publication, its intended audience is the parties themselves, not the bar. *See United States v. Ennenga*, 263 F.3d 499, 504 (6th Cir.2001) (unpublished decisions are not controlling precedent). Accordingly, we will dispense with a factual recitation except to the extent that certain claims, such as the sufficiency of the evidence, require us to notice them.

---

1. Defendants were also convicted of aiding and abetting one another in the commission of bank fraud with respect to the assets of

## II.

1. *Is the Murder for Hire Statute, 18 U.S.C. § 1958, Constitutional?*

Relying upon *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), and *United States v. Morrison*, 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000), both defendants contend that Congress exceeded its authority under the Commerce Clause when it enacted the murder for hire statute, 18 U.S.C. § 1958, because the statute does not address activities that have a "substantial effect" upon interstate commerce, rendering it facially unconstitutional.

In *Lopez* the Court struck down the Gun–Free School Zones Act of 1990 because the "Act neither regulates a commercial activity nor contains a requirement that the possession [of a gun] be connected in any way to interstate commerce." *Id.* at 551. After summarizing the history of the Commerce Clause, the Court identified three "broad categories of activity" that Congress may regulate under its commerce power: 1) the "use of the channels of interstate commerce[;]" 2) the "instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities[;]" and 3) "those activities having a substantial relation to interstate commerce[.]" *Id.* at 558–59. Because the Gun–Free School Zones Act contained "no express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce," *id.* at 562, the Court concluded that the proper test of the Act's constitutionality "requires an analysis of whether the regulat-

---

another person, Danny Gibson, who disappeared at the end of 1997.

ed activity 'substantially affects' interstate commerce." *Id.* at 559.

In *Morrison,* the Court looked to the logic of *Lopez* and struck down 42 U.S.C. § 13981, which provided a civil remedy for victims of gender-motivated violence. The Court reasoned as follows:

> We . . . reject the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce. The Constitution requires a distinction between what is truly national and what is truly local. *Lopez,* 514 U.S., at 568, 115 S.Ct. 1624, 131 L.Ed.2d 626 (citing *Jones & Laughlin Steel,* 301 U.S. at 30, 57 S.Ct. 615, 81 L.Ed. 893). In recognizing this fact we preserve one of the few principles that has been consistent since the Clause was adopted. The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States.

*Morrison* at 617–18. Like the statute at issue in *Lopez,* however, the one struck down by *Morrison* had "no jurisdictional element establishing that the federal cause of action is in pursuance of Congress' power to regulate interstate commerce." *Id.* at 613.

In the wake of *Lopez,* this circuit has had the opportunity to reassess the scope of the Commerce Clause power on several occasions, including a case involving the murder for hire statute. *United States v. Weathers,* 169 F.3d 336 (6th Cir.1999). Although it did not involve a facial challenge to the statute, *Weathers* is instructive. In that case, the events that gave rise to the prosecution all occurred in Kentucky with one exception: the defendant used a cellular telephone to place a call that required the use of a transmission tower located in Indiana. *Id.* at 341.

We noted that, unlike the statute at issue in *Lopez,* § 1958 contains a jurisdictional element. Section 1958(a) provides in part: "Whoever travels in . . . or uses . . . the mail or any *facility in interstate or foreign commerce,* with the intent that a murder be committed . . . and if death results, shall be punished by death or life imprisonment, or shall be fined not more than $250,000, or both." 18 U.S.C. § 1958(a) (emphasis added). As *Weathers* duly observed, "It is well established that telephones, even when used intrastate, constitute instrumentalities *of* interstate commerce." *Id.* at 341. We went on to state that "in order to establish the court's jurisdiction under § 1958, the government must show that the defendant used a 'facility *in* interstate commerce.'" *Id.* at 342. Because defendant's use of a cellular telephone constituted such use, the jurisdictional requirement of § 1958 was satisfied.

In the case before us, of course, the interstate element is far more pronounced. Stewart called Dorman at his home in Texas from Alabama and caused him to drive to Kentucky and Alabama to participate in the crimes against Norris and Nichols respectively.

Although it did not rely upon *Weathers,* the district court reached a similar conclusion:

> The Court concludes that 18 U.S.C. § 1958 does not suffer from the same deficiencies as the laws in *Lopez* and *Morrison.* The statutes in both *Lopez* and *Morrison* did not contain a jurisdictional element. Section 1958, however, forbids individuals to travel in or to cause another to travel in interstate commerce with the intent to commit murder for hire. With this jurisdictional element, § 1958 both explicitly relates to commerce and ensures only those activities affecting interstate commerce fall within its scope. This jurisdictional

element insulates § 1958 from a Commerce Clause challenge.

Memorandum Opinion and Order, August 4, 2000, at 2–3 (citations and quotation marks omitted).

Defendants contend that, rather than look to whether the statute contains a jurisdictional element, we should focus on the third factor discussed by the Court in *Lopez:* whether the activities regulated "substantially affect" interstate commerce. In support, they cite *United States v. Corp,* 236 F.3d 325 (6th Cir.2001), which involved both facial and as applied challenges to the federal statute criminalizing the possession of child pornography. Unlike the statutes struck down in *Lopez* and *Morrison,* the child pornography statute contains a jurisdictional element. *Id.* at 327–28. This court borrowed extensively from the reasoning of *United States v. Rodia,* 194 F.3d 465 (3d Cir.1999), which rejected the contention that the presence of a jurisdictional element automatically saves a statute from a Commerce Clause based challenge. *Corp,* 236 F.3d at 330–31 (quoting *Rodia,* 194 F.3d at 472–73). Rather, the inquiry should be "whether Congress had a rational basis for believing that the intrastate possession of pornography has a substantial effect on interstate commerce." *Rodia,* 194 F.3d at 474.

In addition to their reliance upon *Corp,* defendants make the following point: murder is the kind of violent crime traditionally prosecuted by the state. However, the legislative history of the murder for hire statute only partially supports this position. While Congress clearly recognized that it did not wish to usurp the traditional authority of local prosecutors, it went on to explain that "the Committee believes that the option of Federal investigation and prosecution should be available when a murder is committed or planned as consideration for something of pecuniary value

and the proper Federal nexus, *such as interstate travel, use of the facilities of interstate commerce,* or use of the mails, is present." 1984 U.S.C.C.A.N. at 304–05 (emphasis added).

In the case before us, it is undisputed that the conspiracy involved both interstate travel and use of the facilities of interstate commerce. Hence, the interstate jurisdictional element is not of the attenuated kind discussed in *Corp.* It should be noted that *Corp* did not go as far as to strike down the child pornography statute on its face, but rather found an insufficient interstate nexus based upon the unique facts of the case. As that statute survived a facial challenge, the murder for hire statute does as well.

### 2. Sufficiency of the Evidence

Both defendants contend that the government introduced insufficient evidence at trial to prove guilt beyond a reasonable doubt as to the conspiracy to commit murder for hire count and, in Stewart's case, the aiding and abetting murder for hire and bank fraud counts.

The standard of review for a challenge to the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). When considering the evidence, we must allow the government the benefit of all reasonable inferences and must "refrain from independently judging the credibility of witnesses or weight of the evidence." *United States v. Welch,* 97 F.3d 142, 148 (6th Cir.1996) (citations omitted). Both circumstantial and direct evidence must be viewed "in a light most favorable to the prosecution." *United States v. Humphrey,* 279 F.3d 372, 378

(6th Cir.2002). "Circumstantial evidence alone, if substantial and competent, may support a verdict and need not remove every reasonable hypothesis except that of guilt." *United States v. Talley*, 194 F.3d 758, 765 (6th Cir.1999) (citing *United States v. Keeton*, 101 F.3d 48, 52 (6th Cir.1996)).

### A. Defendant Dorman

■ Dorman takes the position that, while he committed bank fraud with respect to Gibson and Norris, and sold possessions that had belonged to Nichols, he did not knowingly participate in a conspiracy to commit murder for hire. As he puts it in his brief, "knowingly fencing property taken from dead people is not the conspiracy charged against Dorman, and does not violate § 1958." He cites a Fifth Circuit murder for hire case. *United States v. Barnett*, 197 F.3d 138 (5th Cir. 1999), that purportedly applies to his situation. In *Barnett*, three individuals were involved in a murder for hire scheme. One of the three had relatively minimal involvement limited to delivering maps of the homes of the targets and driving by one of those residences with the hit man. *Id.* at 146. The court concluded that, while there was evidence that defendant knew that his cohorts planned an unlawful act, the evidence was insufficient to prove that he knew that act to be murder; simply knowing that "some crime was afoot" is legally insufficient to support the conviction. *Id.* at 147.

The extent of Dorman's involvement in the conspiracy derives in large measure from statements that he made during two grand jury appearances and during an interview with FBI Agent Paul Pape. He conceded during the first grand jury hearing that he and Stewart began to commit bank fraud in 1995. When asked specifically about Norris, Dorman recalled the following:

> [Stewart] was going to get some things set up on a man, at that time he didn't tell me his name, but that it was going to have to move real fast when it was set up, that he would call me. He said that it was going to be a large account.

When asked if he knew that the victim was dead, Dorman acknowledged that he did:

> Yeah, the way [Stewart] said it, he said, "You don't have to worry about the bank calling this man. He can't answer it." And he indicated that he was dead. He wasn't available to take a phone call.

When asked about the murder of Nichols, Dorman gave this account:

> I had been to [Stewart's] place in Eva, Alabama on a job that he had set up, and again, I don't remember the exact times but it was sometime in the last part of '98 or the first part of '99. And he was complaining about the fellows he had doing work for him, going around taking care of people and doing burglaries and stealing things for him.
>
> He was a little upset because they hadn't been doing what he told them to. They come down and he'd expect money, and they didn't even have enough money to get home. He'd have to give them money and not get anything for it, and he gave me an example, talking about Nichols.
>
> He said, "They came down here." He said, "They was supposed to go in there, take care of it, get what I wanted." He said, "They beat the man to death. His mother was there. They did not kill her but thought they had and threw her in a van under him and then didn't even get the van all the way in the water, left it sticking out where it could be seen." And he was real upset with them.
>
> . . . .

He told me, he says, "They can't even hide a body right."

At a second grand jury proceeding, Dorman again testified, this time with the assistance of counsel. He indicated that he had never heard of the Lyons by name until the night that they kidnaped him and went on to reiterate that his involvement with Stewart was limited to bank fraud. He also told the grand jury that he found out about the Norris murder only after cashing the check at the bank and never knew explicitly about the Nichols murder until he was arrested. In fact, with respect to Nichols, Dorman "wanted to know as little as possible about it, I'll be honest with you. I didn't even want to know the name."

In addition to this grand jury testimony, Agent Pape testified during trial about the conversation he had with Dorman on the day of his arrest. With respect to the Norris murder, Dorman allegedly stated that Stewart told him that he "had sent two of his boys, or two of his men, in to do the job but they got—Mr. Stewart tells Mr. Dorman they got overzealous and killed the guy." With respect to the Nichols murder, Agent Pape testified as follows:

> [Dorman] said there was an unsolved murder in Eva, Alabama which involved an elderly man, and he didn't know if it was his mother or his sister, but he knew that there was a lady involved; and that Charlie Stewart had sent his two men in, which at this point Mr. Dorman is kind of theorizing that these two men are the same two men that kidnaped him.

> He said Stewart sent these two guys into this house in Eva, Alabama. They screwed up and then they killed the man, but they didn't kill the wife, or the lady.

Mr. Dorman told me that Charlie Stewart was very angry at this, not because of the death of the man, but because the female was still alive.

Dorman also makes the argument that, rather than a single, overarching conspiracy, the events at issue comprised two distinct conspiracies that were completed at the time each murder was committed. This approach works to his advantage, of course, because he arrived in Kentucky after Norris' death and, under his analysis, could not have been a member of a conspiracy that was completed by the time he arrived on the scene. In a similar vein, he arrived in Alabama to take possession of the victim's property two days after the Nichols murder. In support of his "two conspiracy" theory, Dorman refers us to *United States v. Delpit,* 94 F.3d 1134, 1149–51 (8th Cir.1996) (murder for hire violation complete at time of killing so that defendant could not join conspiracy after that time).

However, a person can be found guilty of conspiracy even if they are not fully aware of its scope and all of its details:

> It is not necessary to show that a defendant knew every member of the conspiracy or the full extent of the enterprise. It is not even necessary for a coconspirator to know about the acts of another coconspirator in order to be held responsible for those acts. Such evidence can be inferred from the interdependence of the enterprise.

*United States v. Carr,* 5 F.3d 986, 990 (6th Cir.1993) (citations omitted). Furthermore, this court has explained the scope of conspiracy doctrine in these terms:

> [U]nder *Pinkerton v. United States,* 328 U.S. 640, 646–47, 66 S.Ct. 1180, 1183–84, 90 L.Ed. 1489 (1946), a coconspirator can be held responsible for the substantive offenses of other coconspirators. In *Pinkerton,* the Supreme Court held that

the crime of conspiracy does not merge into the completed substantive offense, and, thus, the foreseeable crimes committed by a coconspirator in the furtherance of the conspiracy may be imputed to the other coconspirators. *Id.* at 647, 66 S.Ct. at 1184. The Court reasoned that the overt act of one conspirator is imputed to the other coconspirators because each conspirator is in essence the agent of the other. *Id.* at 646–47, 66 S.Ct. at 1183–84. "The criminal intent to do the act is established by the formation of the conspiracy." *Id.* at 647, 66 S.Ct. at 1184. Moreover, one coconspirator need not even know about the acts of another to be held responsible for them. *United States v. Davis,* 809 F.2d 1194, 1203 (6th Cir.), *cert. denied,* 483 U.S. 1007, 107 S.Ct. 3234, 97 L.Ed.2d 740 (1987).

*United States v. Lawson,* 872 F.2d 179, 182 (6th Cir.1989).

The fact that the government initially declined to prosecute Dorman for conspiracy highlights how tenuous is its theory against him. Of course, we must allow the government the benefit of all reasonable inferences and must "refrain from independently judging the credibility of witnesses or weight of the evidence." *Welch,* 97 F.3d at 148 (citations omitted). Both circumstantial and direct evidence must be viewed "in a light most favorable to the prosecution." *Humphrey,* 279 F.3d at 378. That said, what could a rational juror rightly infer to support the conviction?

There was ample evidence that Dorman participated in defrauding Danny Gibson in 1998, believing him to be dead (although not necessarily murdered). In fact, he pleaded guilty to this charge. Second, he learned of the death of Norris at the hands of individuals under the direction of Stewart shortly after the murder. Third, he knew that Stewart had promised to pay those individuals, because he told Dorman that he would now refuse to fulfill his promise because they took the wrong checkbook. Fourth, despite his knowledge of Stewart's *modus operandi,* Dorman remained on call in Texas to assist in the disposal of illegally obtained assets. When called, he appeared in Alabama where he took possession of Nichols' possessions and unloaded them back in Texas. While he may not have known of Nichols' identity because, by his own admission, he "wanted to know as little as possible about it," he was told by Stewart about the killings shortly after they occurred. Finally, there is nothing to indicate that Dorman sought to distance himself from Stewart or otherwise renounce his participation in the ongoing criminal enterprise until his own life was threatened.

The evidence tying Dorman to the actual murders is non-existent. Thus, in order to find him guilty of conspiracy to engage in murder for hire, a juror would have had to conclude that Dorman knew Stewart was recruiting others to commit murders for money, that these murders involved the crossing of state lines or otherwise involved interstate facilities, that these murders were the source of the property that Dorman then helped to convert to cash, and that the converted cash in some manner went to fund the continuing conspiracy.

Our role is not to act as jurors. Rather, we must decide whether sufficient evidence, either direct or circumstantial, existed for a rational juror to conclude beyond a reasonable doubt that Dorman committed this crime. After careful consideration, applying the law to the facts recited above, we hold that the evidence is sufficient to sustain Dorman's conviction for conspiracy to engage in murder for hire.

## B. Defendant Stewart

We turn to the claim of insufficient evidence advanced by defendant Stewart. Given that we have found the evidence sufficient to support the conspiracy conviction of Dorman, it seems logical that a similar conclusion would inevitably apply to Stewart. After all, if the jury's verdict is to be credited, he acted as the "mastermind" of the conspiracy by selecting the victims, recruiting the Lyons to commit the murders, and summoning Dorman to help liquidate the assets. At least one witness, David Turner, testified at trial that Stewart was Dorman's "boss."

However, reaching such a conclusion is not nearly as clear-cut as it initially appears because some of the more damaging evidence introduced during the Dorman trial, such as Dorman's lengthy, inculpatory statement to Agent Pape, was not placed before the Stewart jury. As Stewart reminds us in his brief, we must avoid the temptation to allow evidence from the Dorman trial to sway our decision. Accordingly, we will briefly recount the evidence that we rely upon to support the various counts of conviction and then explain why, in our view, it is enough to support the convictions.

### 1. Murder for Hire Counts

This court has made the following observation about the elements of the murder for hire statute:

> On its face, the statute at issue allows a conviction if the government proves that a defendant traveled in interstate commerce with the intent that a contract murder be committed. This requirement is plain and unambiguous. Moreover, the statute gives no indication that the contract must be in existence and

that the consideration must have been provided at the time of the travel.

*United States v. Ransbottom*, 914 F.2d 743, 746 (6th Cir.1990).

### a. Aiding and Abetting in the Murder for Hire of Norris

■ At trial, David Turner testified that Larry Lyon, whom he met through Stewart, approached him and asked if he wanted to steal checks and money from an "older man" from Robards, Kentucky. However, Lyon indicated that "we will have to clear this through Charlie," referring to Stewart. Turner went on to say that two months later Stewart himself asked if he was interested in "doing a job" with Larry Lyon that involved lots of money and checks. Turner "blew it off" because "all of the money stacked everywhere, people don't do that." Stewart did not mention Norris by name to Turner. However, Joe Caraway, a man Stewart later tried to recruit to kill Dorman, testified that he watched as Stewart burned some documents "on a man named Aaron Norris."[2]

Donald Henson also testified during the trial about conversations that he had with Stewart while sharing the same jail cell. According to him, Stewart spoke at some length about the crimes. With respect to Norris, Stewart allegedly told Henson the following:

> Said he was accused of robbing the old man and killing him. He said the old man they said he robbed and killed, he didn't have no money; lived in an old shack that was paper thin that ... you could push your fingers through the wall. . . .
>
> . . . .
>
> [Stewart] said his nephews killed him; beat him to death with a pick handle.

**2.** Although known as Jack Norris, this victim's first name was actually Aaron.

. . . .

I said, well, if you wasn't there, how did you know it was a pick handle.

[Q] What did he say?

He just looked at me and grinned.

Henson went on to relate that Stewart bragged that "they killed this old farmer" "for his money." When asked about Dorman, Henson recalled Stewart saying "that they had some kind of check cashing scam, or he was a business associate of his; and that's basically what he talked about."

Another jailhouse witness, Ricky Taylor, was in the cell with Henson and Stewart. He, too, testified in the wake of a deal with the authorities. With respect to the Norris murder, Taylor recalled the following:

He described an old farmhouse with thin walls, cracks in the floor, said you could put your hand right through the wall, and said they had beat an old farmer up there about 60 or 70 times with a pick handle.

In our view, a rational juror could conclude beyond a reasonable doubt that Stewart planned the murder of Norris for his assets; that he and his co-conspirator Dorman traveled in interstate commerce to carry out this plan; and that he promised to pay the Lyons to commit the actual murder. Clearly, the evidence supporting the third element of the crime—the "promise or agreement to pay"—is largely circumstantial and requires inferences on the part of the jury. As we have already pointed out, however, "[c]ircumstantial evidence alone, if substantial and competent, may support a verdict and need not remove every reasonable hypothesis except that of guilt." *Talley*, 194 F.3d at 765 (citations omitted). At trial, David Turner testified that defendant attempted to hire him to "do a job" involving an old man that the jury could infer was Norris. Henson testified that defendant bragged about the crime and implied that he may have been present when his nephews killed Norris. Furthermore, as explained below in our discussion of defendant's conviction for aiding and abetting bank fraud, there was testimony that defendant took control of the assets of Norris after the murder and helped to convert them to cash with the help of Dorman. A rational juror could certainly infer that the Lyons were remunerated by defendant for the killing because they were willing to turn over the proceeds of the crime to him. While several critical witnesses who testified against Stewart were convicted felons of suspect credibility, their pasts were made known to the jury. It is not our role to make credibility determinations, which is the province of the finders of fact. Given our standard of review, we conclude that the government introduced sufficient evidence to support Stewart's conviction for aiding and abetting in the murder for hire of Norris.

### b. Aiding and Abetting in the Murder for Hire of Nichols

■ With respect to the Nichols murder, once again Turner provides some of the more damaging testimony. He testified that Stewart told him that he wanted "two older people in Eva, a mother and son," to be "taken care of" in order to steal their checks. Stewart allegedly "wanted the bodies disposed of where they wouldn't be found and the paperwork brought back." Turner told Stewart "I would have to think about it" but never followed up.

In February 1999, shortly before the murder, Jason Persinger, a former roommate of Billy Joe Lyon, recalled Lyon telling them that he was "going to go do a job for his uncle [Stewart], and he was picking his dad up and they were going to Alabama."

Neighbor Jerry Voyles testified that Stewart bragged about how he "got Nich-

ols, and he pulled out a set of driver's license and started laughing, I got Nichols."

Records introduced during trial also indicate that Stewart called Dorman in Texas on February 5, 1999, two days before the Nichols murder. On February 9, Dorman used a credit card in Alabama. The same day, Dorman sold knives belonging to Nichols in a pawn shop back in Texas.

Henson and Taylor also recalled Stewart talking about the Nichols' murder. According to Henson, "later on [Stewart] got talking about the lady and the man that died were duct taped up around the head and the arms and feet." Furthermore, Stewart allegedly "said his nephews done the killing." As for Mrs. Nichols, "[I]t wasn't the bitch's time to die." Taylor confirmed Henson's testimony.

A rational juror could have concluded that defendant selected the victim, and arranged for the Lyons to travel from Kentucky to Alabama in order to murder and rob the Nichols in exchange for payment. Once again, the "promise to pay" element of the crime is the most tenuous. However, the evidence supports an inference that the Lyons turned over the proceeds of the crime to defendant, who in turn entrusted them to Dorman to convert into cash. A rational juror could infer that the Lyons would not have willingly turned the proceeds of the crime over to defendant had they not received assurances of compensation. This conclusion is bolstered by Turner's testimony that Stewart tried to recruit him to "take care of" the Nichols.

Viewing the evidence, as we must, in a light most favorable to the prosecution, *Humphrey,* 279 F.3d at 378, we conclude that the jury's guilty verdict on this count must be affirmed.

#### c. Aiding and Abetting in the Attempted Murder for Hire of Dorman

As mentioned earlier, Stewart tried to recruit Joe Caraway to "make Dorman disappear." According to Caraway, Stewart worried that Dorman knew too much and had been lax about destroying incriminating evidence. After Caraway declined, Stewart asked him to burn down Dorman's house.

Were this the only crime charged, Caraway's testimony would be insufficient to sustain a verdict of guilt. However, the jury heard testimony that defendant had recruited the Lyons to commit two murders before the attempt upon Dorman. They could certainly infer that defendant turned to them to kill Dorman when his overtures to Caraway failed.

While not overwhelming, we believe that the evidence is sufficient to support the jury's verdict on this count.

#### d. Conspiracy to Commit Murder for Hire

Given that we conclude that the evidence is sufficient to support Stewart's convictions for aiding and abetting murder for hire, it follows that the same evidence is sufficient to support the jury's verdict on the conspiracy count of the indictment.

### 2. Aiding and Abetting Bank Fraud Counts

#### a. Gibson

Both David Turner and Damon McCormick testified about being recruited by Stewart to break into Gibson's house.

Caraway also testified that he drove to Kentucky with Dorman and Stewart, who wanted him to "be Mr. Gibson." According to Caraway, Stewart told him "a nephew had gave him that paperwork on Mr. Gibson, the checks and the identification." After being briefed about the check scam,

Caraway was told to obtain a Kentucky driver's license in the name of Danny Gibson. However, in the end it was Dorman who impersonated Gibson, although Caraway also wrote checks in Gibson's name. Regina Griffin, a car dealer, testified how she was given a check for $2,700 by Danny Gibson (or so she thought) in exchange for a Mazda automobile. Caraway identified the check as the one used by Dorman to purchase the Mazda and Griffin also identified Dorman as the man who posed as Gibson.

In short, the jury heard testimony that defendant Stewart obtained the checks that belonged to Gibson and knowingly arranged for Dorman to fraudulently negotiate them. This testimony is more than enough to sustain defendant's conviction for aiding and abetting in bank fraud.

### b. Norris

■ Dorman pleaded guilty to aiding and abetting in bank fraud related to Norris. During Stewart's trial, Suzanne Day testified that she worked as a teller for First Kentucky Bank in Sturgis, Kentucky, in early February 1999. During that time, a man unknown to her tried to negotiate a check drawn on the account of Aaron Jack Norris, allegedly as payment for a truck that Norris had purchased. Day informed the man that the account contained insufficient funds. Later that afternoon, he reappeared with a check drawn on the same account payable to Cleo Campbell in the amount of $1,100. Because the account contained sufficient funds, Day cashed it.

Edna Miller and Cleo Campbell also testified during Stewart's trial. Miller employed Stewart's wife, Tina Butler, as a housekeeper. She also dated Cleo Campbell. In the summer of 1998, she told Butler that she and Campbell would be gone for a weekend. During their absence, Campbell's residence was burglar-

ized and his birth certificate, cash, and deeds were stolen.

As already mentioned, defendant Stewart also tried to recruit Turner to burglarize Norris's residence because he had an "abundance of money, checks and money in the bank." Furthermore, although he did not know specifically whether defendant had obtained any money from "the old farmer," witness Henson testified that defendant told him that he and Dorman "had some kind of check cashing scam." Finally, Caraway testified that, during a visit to Stewart's residence in Alabama, he saw documents, including checks, "on a man named Aaron Norris." According to Caraway, Stewart told him that he was "getting rid of the paperwork where nobody would catch him with it."

As with the other counts of conviction, we are mindful of our standard of review. In our view, the evidence is sufficient for a rational juror to infer that Stewart aided and abetted Dorman in fraudulently negotiating at least one check on the account of Aaron Norris.

### C. Conclusion

With respect to defendants' challenge to the sufficiency of the evidence against them on all counts of conviction, we affirm the verdicts rendered by the juries. As our discussion of the issue makes clear, however, the federal murder for hire statute is not the ideal tool for prosecuting garden variety murder, which is the traditional province of the state judicial system. While we affirm the juries' verdicts, we do so largely based upon our standard of review, which compels us to view both circumstantial and direct evidence in a light most favorable to the prosecution. We are troubled by the relative thinness of the evidence with respect to the "promise or agreement to pay" element of the murder for hire statute developed in the trial

of defendant Stewart. We conclude that it passes muster, but barely. For that reason, the government would be advised to utilize the statute sparingly when the underlying facts do not conform to the typical "hit man" murder for hire case.

3. Issues Raised by Defendant Stewart

*A. Failure to Disclose Discoverable Material in a Timely Manner*

■ Stewart argues that the government's failure to disclose the contents of a tape recording made by Damon McCormick of a conversation that he had with David Turner violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and requires a new trial. The government concedes that, at the very least, it should have disclosed the contents of the tape pursuant to the Jencks Act, 18 U.S.C. § 3500.

The district court denied Stewart's motion for a new trial using the following rationale:

> For *Brady* purposes, impeaching evidence is considered exculpatory. "Materiality does not require that the suppressed evidence establish the defendant's innocence or likelihood of an acquittal.... Rather, *Brady* materiality merely requires 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" [*United States v.]* *Stewart,* 5 Fed.Appx. 402, 407 (6th Cir.2001) (quoting *Kyles v. Whitley,* 514 U.S. 419, 433–34, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *United States v. Mullins,* 22 F.3d 1365, 1371 (6th Cir.1994).
>
> After a review of the record, the Court cannot say that it is reasonably probable that, had the taped conversation been disclosed to the Defendant, the result of the proceeding would have been different. In addition to David Turner, a number of Government witnesses including Donald Henson, Ricky Taylor, Joe Caraway, Jerry Voyles, as well as Pat Compton, implicated Stewart in some way in the murder for hire conspiracy. Similarly, the testimony of Joe Caraway and Damon McCormick implicated Stewart in the bank frauds charged in the Superseding Indictment. While some statements made by Turner in the taped conversation appear to contradict some of Turner's trial testimony, the Court finds that this evidence would not put the whole case in such a different light so to [sic] undermine confidence in the verdict in light of the testimony of these other Government witnesses.

Memorandum Opinion and Order, December 31, 2001 at 3–4. The court then considered whether the Jencks Act violations required a new trial:

> In determining whether to grant a new trial based upon the Government's failure to produce Jencks Act material, the Court must determine whether this error was harmless error. *United States v. Susskind,* 4 F.3d 1400, 1406 (6th Cir.1993) (citing *Rosenberg v. United States,* 360 U.S. 367, 370–71, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (1959)). "Whether an error committed at trial is harmless depends on whether the error is one that might reasonably be thought to have had 'substantial and injurious effect or influence in determining the jury verdict.'" *Susskind,* 4 F.3d at 1406. The Court finds that while a Jencks Act violation did occur, the disclosure of the taped conversation would not have helped Defendant overcome the strong evidence presented by the Government concerning Defendant's connection or

role in the murder for hire conspiracy or the bank frauds.

*Id.* at 4 (citation omitted). We review the denial of a motion for a new trial for abuse of discretion. *United States v. Frost,* 125 F.3d 346, 382 (6th Cir.1997).

The taped conversation itself occurred while Stewart was a fugitive. The two men discussed how "hot" things were getting in Henderson due to the federal investigation. Turner then explained that he was asked about one of the murders, which he denied knowing about. Of interest to the defense is the following part of the conversation:

> Turner: [T]hey're ratting on ... Stewart.
>
> McCormick: No shit?
>
> Turner: Well, hell, yeah. Both of them.
>
> McCormick: He probably didn't even ... do it.
>
> Turner: I don't see why he would.
>
> McCormick: I don't either.
>
> Turner: I mean I don't see no ... benefit to him one way or the other, but you never know....

Clearly, the contents of this tape recording should have been provided to defense counsel. As the district court pointed out, a "closed file" policy places a heightened burden upon the government to review every document in its possession with care to determine whether it contains discoverable material. *See* Memorandum Opinion and Order, December 31, 2001, at 2 n. 1. In this case, the government failed to meet its obligation. The district court went on to conclude, however, and we agree, that there is nothing to suggest that this lapse was intentional. If it were, we would feel compelled to order a new trial. *See United States v. Tincher,* 907 F.2d 600 (6th Cir.1990) (deliberate withholding by the government of Jencks or *Brady* material requires reversal).

The district court did not abuse its discretion when it denied defendant's motion for a new trial. We have reviewed those portions of the trial transcript provided to us with considerable care. They reveal that much of the tape's contents came out during Turner's trial testimony: his reluctance to discuss what he knew, the fact that he lied to investigators, his felony convictions, his involvement in a fraud scheme, and the fact that he had made a deal with the government. Furthermore, the defense called his ex-wife who testified that she never knew him to tell the truth. As a result, we conclude that the district court was correct when it held that, had the contents of the tape been timely disclosed, the result of the trial would not have been different.

### B. Introduction of Evidence Seized When Stewart Was Arrested

■ Stewart next objects to the testimony of former FBI Agent Donald McVay concerning the weapons and ammunition seized from the cave where Stewart had been hiding prior to his arrest. Stewart lodged an objection during trial that the introduction of the weapons was irrelevant and unfairly prejudicial, which the district court overruled.

We review a lower court's rulings on the admissibility of evidence under Federal Rule of Evidence 403 for an abuse of discretion. *United States v. Layne,* 192 F.3d 556, 573 (6th Cir.1999). On balance, we conclude that the marginal probative value of the evidence to show consciousness of guilt was sufficient to render it admissible and therefore the district court did not abuse its discretion in so ruling.

### C. Testimony of Jason Persinger

■ As already discussed, Jason Persinger testified that Billy Joe Lyon told

him that he and his father "were going to go do a job for his uncle [Stewart]" in Alabama. When asked what he took "job" to mean. Persinger replied, "Information I had gathered from the news coverage." Defense counsel's objection led to a sidebar in which the district court prohibited the government from asking further questions about the meaning of "job." On redirect, the government asked, "When you talked about going to Alabama with a job, did he say whether or not he was expecting to get paid?" To which Persinger replied, "Yes, he did say he was expecting—" A defense objection, which was sustained, cut the answer short.

Prior to the Persinger testimony, the district court conducted a discussion with counsel about potential hearsay concerns. The government took the position that Persinger could be asked about Lyon's statements regarding the upcoming trip to Alabama because they fell within the hearsay exception governing future intent. Fed.R.Evid. 803(3). In *Lilly v. Virginia,* 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999), the Court reiterated its holding in *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), that "the veracity of hearsay statements is sufficiently dependable to allow the untested admission of such statements against an accused when (1) the evidence falls within a firmly rooted hearsay exception or (2) it contains particularized guarantees of trustworthiness such that adversarial testing would be expected to add little, if anything, to the statements' reliability." *Lilly,* 527 U.S. at 124–25 (citation and punctuation omitted). However, this term the Supreme Court has qualified the approach first adopted in *Roberts:*

> Although the results of our decisions have generally been faithful to the original meaning of the Confrontation Clause, the same cannot be said of our rationales. *Roberts* conditions the ad-

missibility of all hearsay evidence on whether it falls under a "firmly rooted hearsay exception" or bears "particularized guarantees of trustworthiness." 448 U.S., at 66, 100 S.Ct. 2531, 65 L.Ed.2d 597. This test departs from the historical principles identified above in two respects. First, it is too broad: It applies the same mode of analysis whether or not the hearsay consists of *ex parte* testimony. This often results in close constitutional scrutiny in cases that are far removed from the core concerns of the Clause. At the same time, however, the test is too narrow: It admits statements that *do* consist of *ex parte* testimony upon a mere finding of reliability. This malleable standard often fails to protect against paradigmatic confrontation violations.

*Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 1369, 158 L.Ed.2d 177 (2004). Although the Court stopped short of providing a comprehensive definition of "testimonial," it made clear that such statements are not admissible: "Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.* at 1374.

In the wake of *Crawford,* it appears that Persinger's testimony concerning what Billy Joe Lyon told him implicates the Confrontation Clause if it can be characterized as testimonial. The statements at issue in *Crawford* were made by petitioner's wife during police interrogation, which the Court concluded were testimonial:

> Whatever else the term [testimonial] covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kin-

ship to the abuses at which the Confrontation Clause was directed.

*Id.* at 1374. By contrast, the statements made by Billy Joe Lyon and related by Persinger were simple statements of future intent and were not testimonial. This conclusion is supported by the Court's discussion of hearsay exceptions generally, which it observed "were not testimonial— for example, business records or statements in furtherance of a conspiracy." *Id.* at 1367. In sum, because the statement related by Persinger was not testimonial and was subject to the hearsay exception found in Fed.R.Evid. 803(3), it was properly admitted.

### D. FBI Interview Notes

In addition to the disputed tape recording, Stewart also contends that the government's refusal to turn over FBI "302" forms[3] violated the Jencks Act, which defines "statement" to include either "a written statement made by said witness and signed or otherwise adopted or approved by him" or "a transcription [of a statement], which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement." 18 U.S.C. § 3500(e)(1) & (2).

Defense counsel raised the following concern with the district court: "We noticed that there are no witness interviews with the main witnesses, Turner, Caraway, McCormick.... I guess the government is taking the position that unless the witness *actually reads* the statement and signs it and adopts it, that it's not produced in discovery, and I want to go on the record objecting to that interpretation of the Jencks Act." When asked what its position was by the district court, the government gave the following answer:

What we did not provide them were reports of interviews prepared by law enforcement, predominantly the FBI, which are referred to as FBI 302s, which summarized interviews. Those interviews are not, you know, provided to the witnesses and asked by the witnesses to review and determine whether they're accurate. If we did so, then we would have supplied them a copy. That did not happen. Nor are they considered to be verbatim renditions of the meetings.

After hearing testimony from Agent Pape about how he typically prepared his 302 forms, the district court examined the contested forms in camera and made the following remarks in open court:

I've looked at all of Paul Pape's notes and 302s. His 302s are undoubtedly more full and complete than his notes are, but they are also undoubtedly done after the fact of the interview. They're not done contemporaneously with the oral statement. His notes are, however, but his notes still are not complete sentences; they're thoughts. Sometimes they have quotations in them from time to time.

Case law suggests that that doesn't make them verbatim recitals....

Now, with regard to Agent Williams, I've not taken any testimony from Agent Williams.... [H]is 302 is a more full and complete summary of the interview, and while I'm sure that the agents endeavor to be accurate, there is a difference between an accurate summary of an interview and a substantially verbatim recital of an interview....

There are some more notes of Detective Zanda, but again those notes appear

---

**3.** "An FBI 302 is a form routinely used to memorialize an FBI interview of a witness."

*United States v. Nathan,* 816 F.2d 230, 232 n. 1 (6th Cir.1987).

to be just that; notes, not complete and full sentences. . . .

In *United States v. Nathan*, 816 F.2d 230 (6th Cir.1987), and *United States v. Farley*, 2 F.3d 645 (6th Cir.1993), this court declined to find that the district court committed clear error when it held that FBI 302 interview summaries did not constitute statements covered by the Jencks Act. In *Nathan*, we offered the following explanation:

One purpose of the Jencks Act is to prevent "the undiscriminating production of agent's summaries of interviews regardless of their character or completeness." *Palermo v. United States*, 360 U.S. 343, 350, 79 S.Ct. 1217, 1223, 3 L.Ed.2d 1287 (1959). Indeed, it would "be grossly unfair to allow the defense to use statements to impeach a witness which could not fairly be said to be the witness' own rather than the product of the investigator's selections, interpretations and interpolations." *Id.* This risk does not exist, however, "where a witness has adopted or approved" the agent's notes. *Goldberg v. United States*, 425 U.S. 94, 107, 96 S.Ct. 1338, 1346, 47 L.Ed.2d 603 (1976).

We have previously held that an FBI report of a witness' statement is producible if the notes from the interview were read back to and verified by the witness and if the report summarized the notes without material variation. *United States v. Chitwood*, 457 F.2d 676, 678 (6th Cir.), *cert. denied*, 409 U.S. 858, 93 S.Ct. 141, 34 L.Ed.2d 103 (1972). Under § 3500(e)(2) a substantially verbatim recital of an oral statement made by a witness will suffice if recorded contemporaneously. In *Padin*, we upheld the denial of production of a DEA agent's debriefing report summarizing a witness' interview because only parts of the interview were recorded and be-

cause the witness never adopted the report by signing it, reading it, or having it read to her. *United States v. Padin*, 787 F.2d 1071, 1077–78 (6th Cir.), *cert. denied*, 479 U.S. 823, 107 S.Ct. 93, 93 L.Ed.2d 45 (1986). Also, testimony was given that the agent exercised editorial discretion in the report by recording only statements to which he assigned importance. *Id.* at 1078. The trial court's ruling on such matters is subject to a clearly erroneous standard. *Chitwood*, 457 F.2d at 678.

*Nathan*, 816 F.2d at 236–37 (citations omitted); *see also Farley*, 2 F.3d at 654 ("Under this Court's 'Adoption Test,' a government report of a witness' statement must be produced 'if the notes from the interview were read back to and verified by the witness and if the report summarized the notes without material variation.'") (quoting *United States v. Williams*, 962 F.2d 1218, 1224 (6th Cir. 1992)).

Stewart urges us to reject the "narrow" position taken by the government that unless the witness "adopted or approved" any 302 or other statement, it was not discoverable under the Jencks Act. Although this court has stated in dictum that an FBI agent's "rough notes" may constitute a simultaneous verbatim statement under the Jencks Act even though the witness has not explicitly adopted it, *United States v. Minsky*, 963 F.2d 870, 875 (6th Cir.1992), we believe that our holding in *Nathan* better serves defendants because it protects them from having their statements inaccurately summarized by the questioning agent and then introduced during trial. Accordingly, we affirm the decision of the district court.

*E. Mistrial Based Upon a Racial Slur*

■ During his testimony, witness Donald Henson talked about how he and

Stewart became cell mates. After indicating that they "had already been talking some," Henson recalled that Stewart "said he didn't want any blacks moving in with him. He wanted me to move there."

Defense counsel moved for a mistrial, noting "that we have a couple of African–American jurors. One or two." The court responded, "I'm going to overrule your motion for a mistrial. Do you want me to admonish the jury in some way to disregard the remark, or does that just emphasize it? It's up to you." Defense counsel replied, "We believe that the appropriate relief is a mistrial and that any admonition would simply heighten the awareness of the remark."

This court reviews "for abuse of discretion the district court's denial of a motion for mistrial." *United States v. Yang*, 281 F.3d 534, 549 (6th Cir.2002), *cert. denied*, 537 U.S. 1170, 123 S.Ct. 1015, 154 L.Ed.2d 912 (2003). Deference is given to the district court because "[t]he trial judge is in the best position to determine the nature of the alleged jury misconduct . . . [and] is also in the best position to determine appropriate remedies for any demonstrated misconduct." *United States v. Copeland*, 51 F.3d 611, 613 (6th Cir.1995).

Stewart makes the undisputed point that it is highly inappropriate to interject "gratuitous" references to race into trial proceedings. However, in order to warrant a new trial, "blurt-outs" must be flagrant and pervasive. *United States v. Tocco*, 200 F.3d 401, 421 (6th Cir.2000). In *Tocco*, it was the FBI agent who made the reference to ethnicity; here, it was the witness.

While regrettable, taken alone this unfortunate remark does not warrant a mistrial. The district court offered the defense an opportunity to fashion the remedy short of declaring a mistrial and we find no abuse of discretion in its approach.

### F. Comment Concerning Stewart's Failure to Talk

Stewart next takes issue with the following exchange, which led to a motion for a mistrial. FBI Agent Broshears was testifying concerning the events surrounding Stewart's arrest:

Q. Did you talk with him at all? Was there any discussions of any substance in the vehicle while you were en route [to the jail]?

A. No. The sheriff's deputies had read him his rights at the time of the arrest. And we had asked him if he wanted to talk then, and he said, no, not right now. And basically, we got in the car, and on the trip back—

Defense Counsel: May I approach the bench, your Honor?

. . . .

I move for a mistrial. It's improper to inform the jury through testimony that the defendant has invoked his rights.

The district court denied the motion. We agree with that decision. Agent Broshears' passing remark, while perhaps ill-advised, does not come close to the level of prosecutorial commentary upon a defendant's silence that would require a mistrial.

### G. Did Stewart Invoke his Miranda Rights Prior to Questioning?

Once arrested in Alabama, Stewart was interrogated and answered certain questions put to him. However, he contends that the interrogation never should have occurred because he told agents that he did not wish to speak to them after being advised of his *Miranda* rights.

As just discussed. Agent Broshears testified that the sheriff's deputies read Stewart his rights before he was transported to

the local jail and that he indicated that he did not wish to answer questions "right now."

Officer Chuck Zanda, who was also present at the arrest, testified at the suppression hearing that he read Stewart his *Miranda* rights while transporting him to the jail. Prior to that, Stewart had not responded when Zanda told him, "I've been looking for you for a year." According to Zanda, "He told me that he didn't want to talk to anybody at that time." When asked over objection whether he took "that at [sic] meaning that he invoked his right to remain silent under the Constitution," Zanda replied, "No, sir. I felt like he would talk to me." When they stopped at a Shell station for water, Stewart asked Zanda not to arrest his wife.

After an hour has passed, they arrived at the jail. After being processed, Zanda and Broshears entered the room where Stewart was sitting:

> I give him a copy of the *Miranda* warning. We went over it. I asked him if he understood it. He—the fact is he told me he understood it better than I did. I asked him to sign it indicating that he understood his rights. He did so. And I asked him if he was willing to talk to me. He said he would talk to me. There was some questions he would not answer, and I said that was fine.

During the suppression hearing Agent Broshears echoed Zanda's recollections.

Stewart takes the position that he definitively invoked his *Miranda* rights when he told Zanda that he did not wish to talk to anyone "at that time." Accordingly, questioning should have ceased at that point. *See, e.g., Kordenbrock v. Scroggy*, 919 F.2d 1091, 1096–97 (6th Cir.1990) (en banc) (questioning must cease when defendant states "I can't tell you no more tonight"). However, in his brief, Stewart concedes, "If the invocation of *Miranda* rights is ambiguous or equivocal, further questioning is permissible."

We review the district court's findings of fact for clear error, *United States v. Harris*, 192 F.3d 580, 584 (6th Cir.1999). Other circuits have found no clear invocation of a right to counsel when an initial request to call counsel was ambiguous and the police merely sought clarification. *See Grant–Chase v. Comm'r, New Hampshire Dep't of Corr.*, 145 F.3d 431, 436–37 (1st Cir.1998). In our view, Stewart's assertion of his *Miranda* rights was ambiguous given that he appended the qualifier "at that time" or "right now" to his refusal to answer questions. Moreover, Stewart had his rights explained to him a second time at the jail and signed a waiver. Under the circumstances, the decision of the district court must be affirmed.

### H. Stewart's Statements to Captain Corley

■ While presenting his defense, Stewart called Captain Michael Corley of the Morgan County Sheriff's Department to the stand. Corley testified that he received three calls from Stewart, whom he knew as Larry Butler, in March 1999. During the calls, Stewart—who is related by marriage to Corley—identified himself as a "friend" of Larry Butler.

In the course of his testimony, Corley was asked, "Did he mention if he was afraid?" Corley replied, "Yes, sir[,]," before an objection was lodged and sustained. However, Corley testified that Stewart suggested some other people who may have committed the crimes at issue. Specifically, he blamed Dorman.

At the conclusion of testimony, defense counsel stated for the record that the district court had prohibited introduction of testimony about a warrant that was pending in Florida, which Stewart wished to

proffer as an explanation of why he declined to turn himself in.

We detect no abuse of discretion on the part of the district court in disallowing testimony about the Florida warrant in light of the rest of Corley's testimony.

### 4. Defendant Dorman's Issues

#### A. Sufficiency of the Superseding Indictment

■■■ Dorman contends that the first count of the superseding indictment, which charged him with participating in a conspiracy to commit murder for hire, was insufficient. This is an allegation that we review *de novo*. *United States v. Gatewood*, 173 F.3d 983, 986 (6th Cir.1999).

The count names four members of the conspiracy: Stewart, Billy Joe and Larry Lyon, and Dorman. It then sets out the "manner and means" in these terms:

> It was part of the ongoing conspiracy that CHARLES LOUIS STEWART, hereafter known as STEWART, would identify individuals he believed to have large amounts of money in bank accounts or at their residence. STEWART would provide BILLY JOE LYON, hereafter known as B.J. LYON, and Larry Eugene Lyon, hereafter known as L. Lyon, the name, location, and financial information of the targeted victim. STEWART would direct L. Lyon and B.J. LYON to murder the victim and steal the victim's identification, cash, checks, and other property located at the victim's residence. STEWART promised to pay B.J. LYON and L. Lyon a sum of money in exchange for each murder and burglary. As part of each murder and attempted murder, B.J. LYON and L. Lyon would take cash, checks, identification, and other property of the victim and transfer the stolen property to STEWART, who

would then convert the stolen money, checks, and property to his own use by recruiting RICHARD TIMROD DORMAN to sell the stolen property or withdraw funds from the victim's bank account.

The count then recounts a number of overt acts undertaken in furtherance of the conspiracy. These included the killing of Norris. Included in the description of the acts is the statement, "STEWART met with DORMAN at a truck stop and gave him the checks on Norris' bank account. STEWART told DORMAN not to worry about the bank calling Norris because Norris was dead." The Nichols murder is likewise included in the overt acts section. While it does not allege that Dorman knew of the murder, it does state that he received property stolen from the victim and converted it into cash. Ironically, the last of the overt acts describes the attempted murder of Dorman himself.

To be sufficient, an indictment must state the elements of the offense with sufficient clarity to advise a defendant of the charge being made against him. *See* Fed. R.Crim.P. 7(c)(1); *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974) ("Our prior cases indicate that an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.").

Dorman takes the position that no overt act charged against him demonstrates his planning, conspiring, or even knowing about a plan to commit murder for hire. With respect to Norris, Dorman notes that his role in the affair did not begin until after the murder had been committed.

As we discussed earlier when analyzing Dorman's sufficiency of the evidence claim,

there is no evidence that Dorman participated in either the murder of Norris or of Nichols. However, he is not charged with the substantive crime, but of being a knowing participant in a conspiracy to commit murder for hire. The indictment indicates that he knew of the conspiracy at least from the time that he was told by Stewart "not to worry about the bank calling Norris because he was dead." Despite this knowledge, Dorman participated in the conversion of the next victim's property to cash. While the indictment does not allege that Dorman participated in the murders themselves, it alleges that he had knowledge of the methods and means of the conspiracy and acted to further it.

We hold that the superseding indictment sufficiently informed Dorman of the charges against him.

*B.  Did the District Court Err in Allowing the Admission of Rule 404(b) Evidence?*

██ We have recently explained our approach to Federal Rule of Evidence 404(b):

This court has set forth a three-step process for determining the admissibility of evidence of other acts under Rule 404(b). The first step requires the district court to decide whether there is sufficient evidence that the other act in question actually occurred. If so, the district court must decide whether the evidence of the other act is probative of a material issue other than character. Finally, if the evidence is probative of a material issue other than character, the district court must decide whether the probative value of the evidence is substantially outweighed by its potential prejudicial effect.

*United States v. Haywood,* 280 F.3d 715, 719–20 (6th Cir.2002) (citations and punctuation omitted). We review the district court's finding with respect to whether the prior bad act actually occurred for clear error. *United States v. Merriweather,* 78 F.3d 1070, 1074 (6th Cir.1996). The second two inquiries are reviewed for abuse of discretion. *Haywood,* 280 F.3d at 720.

Over Dorman's objection, the government introduced a substantial amount of evidence concerning the disappearance of Danny Gibson and Dorman's role in the theft of his assets, as well as evidence of Dorman's participation in the defrauding of the estate of J.L. White. Dorman argued below that both crimes occurred before the conspiracy allegedly began, did not involve murder for hire, and, with respect to Gibson, Dorman had pleaded guilty to the underlying crime.

After considering the arguments of counsel, the district court reached this conclusion:

I think it's got some probative value with respect to his knowledge.... And I think that's the issue in this case is what he knew about the murders being committed of these people, Nichols and Norris.

And the evidence with respect to White and Gibson tends to show what he may have known about that. And sure it's prejudicial, but I don't think it's undue prejudice, and I think the probative value is greater than the prejudice. So I will allow the evidence.

Dorman analogizes his situation to that faced by the defendant in *Haywood, supra.* In that case, defendant was charged with intent to distribute crack on August 1, 1997. During trial, the district court allowed the government to introduce evidence that he also possessed a relatively small amount of crack the following December on the theory that it helped to establish intent and was therefore admissible pursuant to Rule 404(b). We disa-

greed: "Haywood's possession of a small quantity of crack cocaine for personal use on one occasion ... sheds no light on whether he intended to distribute crack cocaine in his possession on another occasion nearly five months earlier." *Id.* at 721. Moreover, this court went on to observe that the district court had failed to balance the probative value against the prejudicial value of the evidence. *Id.* at 723.

As with so many other issues raised in this appeal, the admission of the Rule 404(b) evidence against Dorman represents a close call that we review for an abuse of discretion. As the district court recognized, the evidence had some probative value with respect to Dorman's knowledge of the scope of the conspiracy, which included stealing the assets of the dead. Under the circumstances, we cannot say that the district court abused its discretion in permitting its introduction.

### C. Dorman's Sentence

Finally, Dorman contends that he should have only received a ten-year sentence for his conspiracy conviction. The statute provides a sliding scale of penalties: ten years for a conviction, but "if death results, [defendant] shall be punished by death or life imprisonment...." 18 U.S.C. § 1958(a). We review questions of statutory construction *de novo. United States v. Suarez*, 263 F.3d 468, 476 (6th Cir.2001).

The thrust of Dorman's argument is that he is being punished with disproportionate severity given that he did not take part in either of the murders. However, he was convicted of conspiracy to commit murder for hire and the jury was instructed to convict only if it found that he knew of the object of the conspiracy and helped to advance it.

We detect no error in the imposition of a life sentence.

### III.

The judgments of conviction against defendants Stewart and Dorman are **affirmed.**